UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WRIGHT'S WELL CONTROL                    CIVIL ACTION
SERVICES, LLC


VERSUS                                   NO: 15-1720


OCEANEERING                              SECTION: R
INTERNATIONAL, INC. AND
CHRISTOPHER MANCINI

## ORDER AND REASONS

Defendants Oceaneering International, Inc. and Christopher Mancini move the Court to dismiss plaintiff Wright's Well Control Services, LLC's tort and breach of contract claims under Rule 12(b)(6).  For the following reasons, the Court grants in part and denies in part defendants' motion.


## I.     FACTS

### A.    WWCS's Hydrate Remediation System

This patent infringement, breach of contract, and unfair competition case arises out of a dispute between plaintiff Wright's Well Control Services, LLC ("WWCS") and defendants Oceaneering International, Inc. and Christopher Mancini, an Oceaneering employee.  The dispute concerns a technological system that WWCS developed for removing hydrates from

subsea, deepwater pipelines.  According to WWCS's complaint, a hydrate is an ice-like solid that forms when water becomes mixed with oil and/or gas at high pressure and low temperature.[1]  Hydrates can cause a pipeline to become blocked by "hydrate plugs," resulting in a loss of production.[2]  WWCS alleges that in 2008, Oceaneering tried and failed to remove hydrates from a pipeline for ATP Oil and Gas Corporation.[3]  ATP then asked WWCS to review Oceaneering's work, prompting WWCS to spend 18 months researching, testing, and developing a new system for preventing and removing hydrates in deepwater environments.[4]  According to WWCS, its remediation system overcame many of the design challenges that plagued earlier systems and provided a faster, safer, and more cost-effective way to clear hydrates in deepwater environments.[5]

---

[1] R. Doc. 41 at 3.

[2] *Id.* at 3-4.

[3] *Id.* at 7.

[4] *Id.* at 4-7.

[5] *Id.* at 4-6.

2

## B.    The Nondisclosure Agreement

On December 11, 2009 WWCS and Oceaneering allegedly executed a Reciprocal Nondisclosure of Confidential and Proprietary Information Agreement (the "NDA").[6] WWCS alleges that the NDA was intended to allow the parties to share information necessary to complete the ATP job and future joint hydrate remediation projects, while simultaneously protecting each company's confidential and trade secret information.[7]

The NDA's introductory section states: "It is the intention of the parties to this Agreement to exchange proprietary information.  The disclosure and use of any proprietary data shall be governed in accordance with the following . . . ."[8] Section One defines the "information" that is covered by the NDA:

> For the purpose of this Agreement, confidential and proprietary information "Information" shall be defined as but not limited to, performance, sales, financial, contractual, and special marketing information, ideas, technical data, all intellectual property including inventions, patents, pending patents and all other business, technical and financial information that the Disclosing Party develops, learns or obtains during the period over which it is (or is supposed to be) providing services as contracted for between the parties that relate to Recipient Party or the business or demonstrably anticipated business of the Recipient Party, or that are received by or for Recipient Party in confidence and

---

[6] *See* R. Doc. 41-3.

[7] R. Doc. 41 at 7.

[8] R. Doc 41-3 at 1.

3

concepts originated by the Disclosing Party. Proprietary information is further defined as data not previously available to the Receiving Party or others without restriction, nor normally furnished to others without compensation, and which the Disclosing Party desires to protect against unrestricted disclosure or competitive use, and which is furnished pursuant to this Agreement and appropriately identified as being proprietary when furnished.[9]

Two provisions restrict a recipient's use of shared information. Section Two states: "With respect to all proprietary information disclosed hereunder, the Recipient agrees that for a period of three (3) years following the date of this Agreement, unless terminated sooner by either party, such party shall not . . . use such information except for purposes of its business relationship with the Disclosing party."[10] Section Four provides: "Neither party shall divulge or use any proprietary information disclosed to it hereunder by the other party for any purpose not connected with the effort contemplated by the agreement."[11]

Section Six places limits on a recipient's duty to "protect and handle" proprietary information with care. It provides, in relevant part:

-----

[9] *Id.* at 1.

[10] *Id.*

[11] *Id.* at 2.

The obligation with respect to the protection and handling of proprietary information, as set forth in this Agreement, is not applicable to the following:

a) Information which is or becomes lawfully known or available to the receiving party without restriction from a source other than the Disclosing Party.

b) Information which is or later falls within, the public domain without breach of this Agreement by the recipient.

c) Information disclosed by the Disclosing Party to others on a nonrestrictive basis.[12]

The NDA also contains a choice of law provision, which states: "This agreement is made subject to and shall be construed under the laws of the State of Texas (excluding its conflicts-of-laws principles)."[13]

###    C.    The Parties' Working Relationship and Oceaneering's Alleged Misappropriation of WWCS's Technology

WWCS alleges that after entering the NDA, it disclosed to Oceaneering the requirements of a functioning hydrate remediation system and provided confidential information on the alignment, deployment, and operation of system components--information that Oceaneering allegedly did not have and could not have obtained without WWCS.[14]

---

[12] *Id.*

[13] *Id.* at 3.

[14] *Id.*

According to WWCS, its remediation system successfully cleared hydrates from ATP's pipeline.[15] WWCS and Oceaneering then worked together on a second project, using WWCS's system to remove hydrates from a pipeline for Marubeni Oil and Gas.[16] After the Marubeni job, WWCS and Oceaneering allegedly performed one more joint remediation project, this time for Williams Oil and Gas.[17] Because WWCS's pump was temporarily unavailable when the Williams project began, WWCS modified its subsea separator to connect with Oceaneering's pumps.[18] WWCS demonstrated to Oceaneering how to modify components of its system to connect to Oceaneering's skid and shared schematics and other confidential information.[19] After the Williams job in 2011, Oceaneering allegedly refused to perform any additional hydrate remediation work with WWCS.[20]

WWCS alleges that Oceaneering used the information that WWCS disclosed under the NDA to create its own remediation system.[21] According

---

[15] *Id.* at 10.

[16] *Id.* at 11.

[17] *Id.*

[18] *Id.* at 11-12.

[19] *Id.*

[20] *Id.* at 12.

[21] *Id.* at 16.

to WWCs, Oceaneering began developing schematics based on WWCS's information as early as March 1, 2010.[22]  By early 2012, Oceaneering had created a working system, which it used to bid against WWCS for multiple hydrate remediation projects.[23] To date, Oceaneering has allegedly bid against WWCS on remediation jobs for at least six different oil and gas companies.[24]

### D.    The BP Thunder Horse Restriction Project

WWCS alleges that it did not discover Oceaneering's duplicity until it lost a hydrate remediation project to Oceaneering in July 2013.  In 2012, BP plc and WWCS allegedly began discussing a contract for supplying hydrate remediation services, known as the Thunder Horse Restriction Project.[25] After a lengthy bidding process, BP notified WWCS that it would not receive the contract on July 11, 2013.[26]  WWCS later learned that BP had awarded the contract to Oceaneering.[27]  WWCS alleges that prior to July 11, 2013 it had no way of knowing that Oceaneering was bidding for hydrate remediation

---

[22] *Id.* at 16.

[23] *Id.* at 17.

[24] *Id.*

[25] *Id.* at 14.

[26] *Id.*

[27] *Id.*

projects or that it was using WWCS's proprietary information to do so.[28] According to WWCS, Oceaneering deployed its remediation system on private boats in several thousand feet of water, making it impossible for WWCS to immediately detect the misappropriation of its proprietary information.[29]

### E.    The Patent Applications

On December 24, 2010, just over a year after entering the NDA with Oceaneering, David Wright and Jeffery Dufrene Filed two U.S. non-provisional patent applications, each of which was directed to specific aspects of WWCS's remediation system.[30]    According to WWCS, US. Patent Application No. 12/978,486, now issued as U.S. Patent No. 8,413,725, describes and claims the subsea separator used in WWCS's remediation system.[31] Application No. 12/978,448, which is still pending, describes aspects of the entire remediation system, focusing specifically on the system's use of a subsea hydraulic positive displacement pump.[32]  The United States Patent

---

[28] *Id.* at 14-15.

[29] *Id.* at 15.

[30] *Id.* at 13.

[31] *Id.*  According to WWCS, Wright and Dufrene have assigned all rights and interest in the '725 Patent to WWCS.

[32] *Id.*

and Trademark Office published both patent applications on June 30, 2011.[33] WWCS alleges that defendant Mancini, an Oceaneering employee, used WWCS's patent applications and other information disclosed under the NDA to file multiple patent applications listing himself as the inventor of various aspects of WWCS's remediation system.[34]

### F.   WWCS's Lawsuit and Defendants' Motion to Dismiss

WWCS filed this lawsuit on May 21, 2015, pleading patent infringement, breach of contract, and numerous tort claims against Oceaneering and Mancini.[35] WWCS also alleges that both defendants misappropriated its trade secrets in violation of both the Texas Uniform Trade Secrets Act (TUTSA) and the Louisiana Uniform Trade Secrets Act (LUTSA).[36]  WWCS alleges that the Court has original, exclusive jurisdiction over its patent infringement claim under 28 U.S.C. § 1338(a)[37] and supplemental jurisdiction over its related state law claims.  Defendants jointly moved to dismiss every non-patent claim under

---

[33]  *See* R. Doc. 41-1 at 2 (the '725 Patent, indicating a publication date of June 30, 2011); R. Doc. 41-6 (the '444 Patent Application, indicating the same publication date).

[34]  *Id.* at 17-20.

[35]  R. Doc. 1.

[36]  *Id.* at 22-26.

[37]  Section 1338(a) states, in relevant part: "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . ."

Rule 12(b)(6), arguing that each claim is time-barred and raising various other challenges to the sufficiency of WWCS's pleadings.[38]

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir.2009).  But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

A legally sufficient complaint need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic

---

[38] R. Doc. 31-1.  Defendants' motion originally sought dismissal of WWCS's original complaint.  WWCS responded by amending its pleadings, *see* R. Doc. 41, and filing an opposition to defendants' motion to dismiss.  R. Doc. 52.  Defendants then filed a reply to WWCS's opposition, which argues that WWCS's amendment to its pleadings failed to remedy the deficiencies identified in defendants' motion to dismiss.  R. Doc. 54.  Accordingly, the Court construes defendants' motion as seeking dismissal of the first amended complaint, which has now superseded the original.

recitations of the elements of a cause of action. *Id.* In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 257. If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed. *Twombly*, 550 U.S. at 555.

## III. DISCUSSION

### A. WWCS's Breach of Contract Claim

WWCS alleges that Oceaneering breached the NDA by using information disclosed by WWCS without permission and for purposes not contemplated by the agreement.[39] Specifically, WWCS claims that it shared information about its hydrate remediation system in order to facilitate joint remediation projects and that Oceaneering used that information to develop its own remediation technology.[40] Oceaneering gives three arguments for why WWCS has failed to state a breach of contract claim. After addressing the choice of applicable law, the Court considers each argument in turn.

---

[39] R. Doc. 41 at 26.

[40] *Id.* at 7-10, 12-13.

The NDA contains a choice of law provision, which states: "This agreement is made subject to and shall be construed under the laws of the State of Texas (excluding its conflicts-of-laws principles)."[41] Under Louisiana law, which would otherwise apply,[42] contractual choice of law provisions are valid unless the chosen law contravenes the public policy of the state whose law would otherwise apply.   La. Civ. Code art. 3540.  Here, no party has contested the validity of the NDA's choice of law; nor has anyone argued that enforcing the provision would contravene the public policy of any state.  Thus, the provision is enforceable as written, and the Court will apply Texas law to WWCS's breach of contract claim.

Under Texas law, "[t]he elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Hunn v. Dan Wilson Homes, Inc.*,

---

[41] R. Doc. 41-3 at 3.

[42] Under Fifth Circuit law, "it is well-settled that choice of law issues for supplemental state law claims . . . are governed by the forum state in which the federal court is sitting." *Janvey v. Brown*, 767 F.3d 430, 434 (5th Cir. 2014).  Here, WWCS invokes this Court's original jurisdiction over its patent claim under 28 U.S.C. § 1338(a) and supplemental jurisdiction over its state law breach of contract and tort causes of action.  Thus, the Court applies the law of the forum state, Louisiana, to choice of law issues concerning WWCS's breach of contract claim.

789 F.3d 573, 579 (5th Cir. 2015) (quoting *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex.App.—El Paso 2009, *no pet.*)).

When interpreting a written contract, "a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). The court "may consider the facts and circumstances surrounding a contract, including the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties transaction." *Kachina Pipeline Co., Inc. v. Lillis*, No. 13-0596, 2015 WL 5889109, at *3 (Tex. 2015) (quoting *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014)). Nonetheless, while a court may consider evidence of circumstances to "inform the contract text and render it capable of only one meaning, extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity." *Id.* "A contract is unambiguous if it can be given a definite or certain legal meaning. On the other hand, if the contract is subject to two or more reasonable interpretations . . . the contract is ambiguous, creating a fact issue on the parties' intent." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).

      1.    *The Identification Requirement*

13

First, Oceaneering argues that its alleged use of WWCS's information did not breach the NDA because Oceaneering did not identify its information as proprietary at the point of disclosure.[43]  WWCS does not contend that it so identified any of its information; rather, it argues that the NDA does not contain a general identification requirement and that all of the information it disclosed to Oceaneering was protected under the agreement's terms.[44]

The NDA's introductory section states that "[t]he disclosure and use of any proprietary data shall be governed in accordance with the following . . . ."[45] Section Two provides that "for a period of three (3) years following the date of this agreement," the Recipient Party may not to use "proprietary information" disclosed under the NDA "except for purpose of its business relationship with the Disclosing Party."[46]  Similarly, Section Four states: "Neither party shall divulge or use proprietary information disclosed to it hereunder by the other party for any purpose not connected with the effort contemplated in this agreement."[47]  The definition of "proprietary information"--and therefore the

---

[43] R. Doc. 32-1 at 37-38.

[44] *Compare* R. Doc. 32-1 at 21-23 *with* R. Doc. 52 at 16.

[45] R. Doc. 41-3 at 2.

[46] *Id.*

[47] *Id.* at 3.

scope of the non-use duty created by the NDA--is set forth in Section One.

That provision states:

> For the purpose of this Agreement, confidential and proprietary information "Information" shall be defined as but not limited to, performance, sales, financial, contractual, and special marketing information, ideas, technical data, all intellectual property including inventions, patents, pending patents and all other business, technical and financial information that the Disclosing Party develops, learns or obtains during the period over which it is (or is supposed to be) providing services as contracted for between the parties that relate to Recipient Party or the business or demonstrably anticipated business of the Recipient Party, or that are received by or for Recipient Party in confidence and concepts originated by the Disclosing Party.   Proprietary information is further defined as data not previously available to the Receiving Party or others without restriction, nor normally furnished to others without compensation, and which the Disclosing Party desires to protect against unrestricted disclosure or competitive use, *and which is furnished pursuant to this Agreement and appropriately identified as being proprietary when furnished.*[48]

According to Oceaneering, Section One's final clause establishes an identification requirement that applies to everything that is disclosed under the NDA.  Thus, Oceaneering argues, information not "appropriately identified as being proprietary" does not fall within the NDA and does not trigger  the recipient's duty of non-use under the agreement.  By contrast, WWCS argues that the first and second sentences of Section One have independent

---

[48] *Id.* at 2. (emphasis added).

significance.  The first sentence instructs that the NDA encompasses a wide range of information sources, including "ideas, technical data, [and] all intellectual property."  Sentence two provides for NDA protection of any other kind of information that the parties share but desire to protect against unrestricted use, provided the information is not previously available to the recipient or others, is not usually furnished without consideration, and is appropriately identified as proprietary.  Under this view, only information in the second, "catch-all" category is subject to an identification requirement. Items encompassed by the first category are proprietary regardless of whether they are identified as such to the recipient.  According to WWCS, this includes all of the technical data and intellectual property that it disclosed to Oceaneering.[49]

At bottom, the parties' disagreement concerns the nature of the relationship between the two sentences of Section One.  The key word in resolving this dispute is "further"--as in, "proprietary information is *further* defined."  Because the word "further" is reasonably susceptible to more than one meaning in this context, Section One is ambiguous.  For instance, when used as an adverb, "further" can mean "to a greater extent; more."  *Oxford*

---

[49] *Compare* R. Doc. 32-1 at 21-23 *with* R. Doc. 52 at 16.

*English Dictionary* Online, www.oed.com (last visited November 5, 2015) (defining further); *see also Merriam-Webster Dictionary* Online, www.merriam-webster.com (last visited November 5, 2015) (defining further as "to a greater degree or extent"); THE RANDOM HOUSE COLLEGE DICTIONARY 536 (1980) (defining further as "at or to a more advanced point; to a greater extent"). This definition suggests cumulativeness--an elaboration or continuation of a previously expressed concept or idea. *See e.g.*, *Metroplex Corp. v. Thompson Indus., Inc.*, 25 F. App'x 802, 807 (10th Cir. 2002) (concluding that the use of "further" in the second sentence of a contractual provision "implies that [the] sentence is a continuation of the previous one"). Here, a cumulative definition of "further defined" supports defendants' interpretation. If Section One's second sentence is a continuation of what came before, then the two sentences together set forth a single definition of "proprietary information" with a single set of attributes and limitations. In that case, sentence two's identification requirement would apply to everything that a disclosing party sought to protect under the NDA.

Importantly, "further" can also mean "in addition, additionally; moreover." *Oxford English Dictionary* Online, www.oed.com (last visited November 5, 2015) (defining further); *see also Merriam-Webster Dictionary* Online, www.merriam-webster.com (last visited November 5, 2015) (defining

further as "in addition"); THE RANDOM HOUSE COLLEGE DICTIONARY 536 (1980) (defining further as "in addition; moreover").  An idea that is "in addition" to something else need not have any particular connection to what came before.  Indeed, when used in this way, "further" can suggest that two ideas are independent or distinct.  *See e.g.*, *United States v. Yah*, 500 F.3d 698, 704 (8th Cir. 2007) (construing "further" in the second promise of a plea agreement and "also" in the third promise to demonstrate the independence of the three promises).  This definition supports WWCS's position because it suggests that Section One's two sentences set forth independent, self-contained categories of protected information.  In other words, the "ideas, technical data, intellectual property" and other items that fall within sentence one's ambit would receive NDA protection even if not "appropriately identified as proprietary," as required by sentence two.

Nothing in the NDA's text or structure conclusively indicates which definition of "further" the parties intended; nor has any party advanced an argument as to why their reading is superior that of the other side.  The Court therefore finds that Section One is reasonably susceptible to both interpretations offered by the parties.  Because the NDA does not unambiguously impose a general identification requirement, the Court cannot

conclude at this stage that WWCS's disclosures fell short of the NDA's procedures for protecting information.

### 2. The Section 6 Argument

Oceaneering's second argument centers on two non-provisional patent applications filed by David Wright and Jeffery Dufrene.  The first, U.S. Patent Application No. 12/978,486, now issued as U.S. Patent No. 8,413,725, describes and claims the subsea separator used in WWCS's hydrate remediation system.  The second, U.S. Patent Application No. 12/978,448, describes aspects of the hydrate remediation system as a whole, including the subsea displacement pump and its use within WWCS's system.[50]  The United States Patent and Trademark Office published both applications on June 30, 2011, eighteen months after the parties allegedly executed the NDA.[51] Oceaneering argues that under Section Six of the agreement, the publication of these patent applications removed any contractual duty it may have had to WWCS.[52]

Section Six states that a recipient's "obligation with respect to the protection and handling of proprietary information" is not applicable to,

---

[50] R. Doc. 41 at 2.

[51] See R. Doc. 41-1 at 2 (the '725 Patent, indicating a publication date of June 30, 2011); R. Doc. 41-6 (the '444 Patent Application, indicating the same publication date).

[52] R. Doc. 32-1 at 23-26.

among other things, "[i]nformation which is within *or later falls within*, the public domain without breach of this Agreement by the recipient."[53] Importantly, this provision use prospective language.  If, at any point, an informational item "falls within the public domain," the effect is that the item was never protected by the NDA at all.  So the recipient is not merely absolved of an existing contractual duty to protect and keep the item confidential; rather, the recipient never had any such duty in the first place.

It is undisputed that "a published patent application, like a patent, is readily available." *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 612 (5th Cir. 2011) (noting that "the United States Patent and Trademark Office and Google both allow free online searching of published patent applications").  Thus, everything contained in WWCS's published patent applications is now in the public domain.  Under Section Six's unambiguous terms, Oceaneering does not now, nor has it ever, had any duty "with respect to the protection and the handling" of any such information.  To the extent that WWCS bases its breach of contract claim on Oceaneering's use of information that appears in WWCS's patent applications, its claim is without merit. *GP II Energy, Inc. v. Chamberlain, Hrdlicka, White, Williams & Martin*, No. 14−07−00237−CV, 2008 WL 4354931, at *8

---

[53] R. Doc. 41-3 (emphasis added).

20

(Tex.App.—Houston [14th Dist.] 2008, *no pet.*) (upholding summary judgment on breach of contract claim when unambiguous language of agreement "imposed no duty on the Escrow Agent to disclose any knowledge the Escrow Agent might have," and therefore party "did not have duty to disclose this information"); *Am. Nat. Fire Ins. Co. v. Hammer Trucking, Inc.*, No. 2-04-327-CV, 2006 WL 3247906, at *3 (Tex. App.--Forth Worth 2006) ("Because American had no duty to indemnify Hammer, no breach of contract occurred.").   That Oceaneering's alleged misconduct may have occurred before the applications became publicly available is irrelevant.

Nonetheless, Section Six is not entirely dispositive.  As WWCS correctly notes, its complaint alleges that some of the information that it disclosed under the NDA does not appear in its applications and has not otherwise been made available to the public.  Specifically, WWCS alleges that it disclosed--and has kept secret--drawings and schematics, test results for components of its remediation system, and certifications for materials used to construct the system.[54]  Accepting WWCS's factual allegations as true, the Court concludes that WWCS has adequately pleaded a claim for breach of the NDA.  While WWCS may not pursue a breach of contract claim premised on Oceaneering's use of information that is contained in its patent applications, the Court will

---

[54] R. Doc. 41 at 9.

not dismiss its claim with respect to information that was not included in either of those (now publicly-available) documents.

### 3.   The Expiration Argument

Third, Oceaneering argues that it cannot have breached the NDA because any duty of non-use imposed by that agreement has now expired.[55] Oceaneering cites Section Two, which states:

> With respect to all proprietary information disclosed hereunder, the Recipient Party agrees that for a period of three (3) years following the date of this Agreement, unless terminated sooner by either party, such party shall not:
>
> a) Use such information except for purposes of its business relationship with the Disclosing Party, or,
>
> b) Disclose such information to any third party unless, further disclosure is previously approved in writing by an authorized representative of the Disclosing Party.  Authorized proprietary information disclosures to third parties shall be made subject to restrictions of use and further disclosures consistent with the restrictions imposed hereby.[56]

By its plain terms, this provision provides that a recipient's duty to limit is use of and to avoid disclosing information that it obtains under the NDA expires three years after the NDA's date of execution.

---

[55] R. Doc. 31-1 at 28-29.  While defendants specifically raise this argument against WWCS's trade secret misappropriation claim, it is also relevant to WWCS's allegation that Oceaneering breached the parties' NDA.  Therefore, the Court will consider it here.

[56] R. Doc. 41-3 at 2.

22

Nonetheless, WWCS contends that the non-use obligation extends beyond the NDA's third year.  To support this argument, WWCS cites Section Four: "Neither party shall divulge or use any proprietary information disclosed to it hereunder by the other party for any purpose not connected with the effort contemplated by the agreement."[57]  WWCS contends that because this provision contains no time limitation, Section Four's mandate remains in effect even after Section Two has expired.[58]

Sections Two and Four both refer to the same contractual duty--the duty to abstain from using information disclosed under the NDA except for purposes of the parties' businesses relationship.  Thus, the Court can see no way to harmonize Section Two's mandate that the usage limitation expires after three years with the Section Four language containing no time limitation. The Court therefore applies the well-settled rule of construction that "a specific contractual provision prevails over a general provision."  *In re Davis Offshore, L.P.*, 644 F.3d 259, 266 (5th Cir. 2011); *see also Barnard Const. Co. v. City of Lubbock*, 457 F.3d 425, 429 (5th Cir. 2006) (noting that the rule that "general terms . . . will be overcome and controlled by specific language dealing with the same subject" can resolve apparent ambiguities that appear on the surface

---

[57] *Id.* at 3.

[58] R. Doc. 52 at 19.

of a contract).  Because Section Two is the more detailed and specific of the two provisions, it prevails to the extent that it conflicts with Section Four.

WWCS alleges that the parties executed the NDA on December 11, 2009.[59]  Under Section Two, the NDA's usage restrictions expired three years later, leaving the parties free to use information that they had received under the NDA for any purpose--including purposes not related to the parties' business relationship.  Thus, actions by Oceaneering that occurred after December 11, 2012 cannot form the basis of a breach of contract claim.  *See AMS Constr. Co. v. K.H.K. Scaffolding Houston, Inc.*, 357 S.W.3d 30, 41 (Tex.App.—Houston [1st Dist.] 2011, *pet. dism'd*) ("A breach occurs when a party fails or refuses to do something he has promised to do.").  Nonetheless, Oceaneering is not entitled to a complete dismissal of WWCS's cause of action.  WWCS alleges that Oceaneering began using shared information to build its own hydrate remediation system shortly after the NDA was executed in 2009.  Specifically, it claims that "Oceaneering was potentially developing drawings based on WWCS's information as early as March 1, 2010," well before Section Two's expiration date.[60]   At the time this alleged misconduct began, Oceaneering was duty-bound to abstain from using NDA-protected

---

[59] R. Doc. 41 at 7.

[60] *Id.* at 16.

information "except for purposes of its business relationship" with WWCS.[61] WWCS has adequately pleaded its claim for breach of that then-existing contractual duty.

In sum, WWCS has sufficiently pleaded a claim for breach of contract under Texas law. While WWCS has no contractual cause of action with respect to (1) information that is contained in its published patent applications or (2) actions by Oceaneering that postdate December 11, 2012, it may proceed with its claim to the extent it does not fall into these categories.

## B.   WWCS's Trade Secret Misappropriation Claim Under TUTSA

In addition to its breach of contract claim, WWCS alleges that Oceaneering and Mancini misappropriated its trade secrets in violation of the Texas Uniform Trade Secret Act (TUTSA). TUTSA permits a claimant to recover damages for actual loss caused by the misappropriation of a trade secret. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134A.004. The statute defines "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable

---

[61] R. Doc. 41-3 at 2.

by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6).   TUTSA's definition of "misappropriation" includes, among other things, the disclosure or use of a trade secret of another, without express or implied consent, by a person who, at the time of disclosure, knew or should have known that knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.   Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3)(B).   Importantly, however, TUTSA's provisions govern only "the misappropriation of a trade secret made on or after" the statute's effective date, September 1, 2013.   2013 Tex. Sess. Law Serv. Ch. 10, § 1 (S.B. 953) (West).   Acts of misappropriation that occurred before that date are governed "by the law in effect immediately before" TUTSA came into effect.   *Id.*

WWCS claims that various items that it disclosed under the NDA are "trade secrets" within the meaning of TUTSA, including

(1) schematics, or drawings, of the system and separator, (2) all necessary testing for each component of the system, (3) material certifications for the materials used to construct the system, (4) all necessary drawings to show how the system connects to the wellhead or pipeline, as well as how each component must be

connected and arranged, and (5) all engineering relating to the separator, pump, and pad eyes used for lifting the system safely.[62]

WWCS claims to have disclosed these trade secrets in reliance on the parties' confidential relationship. And it alleges that defendants' use of WWCS's trade secret information to build their own hydrate remediation system exceeded the scope of permissible use under the NDA and therefore constituted misappropriation.

Citing NDA Section Two, defendants argue that because their duties under the NDA expired on December 11, 2012, nine months before TUTSA became law, WWCS's TUTSA claims must fail. WWCS responds by arguing that the non-use duty imposed by the NDA has not actually expired--an argument that the Court has already rejected.[63]

Under TUTSA, "misappropriation" means, among other things, the use of another's trade secret, without permission, by a person who knew that the secret was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3)(B). To prevail under this provision, WWCS must identify some duty that defendants breached by using WWCS's secrets. Because TUTSA does not

---

[62] R. Doc. 41 at 9.

[63] *Compare* R. Doc. 32-1 at 28-29 *with* R. Doc. 52 at 19.

govern actions that predate its effective date, the breach also must have occurred--and, hence, the duty must have existed--on or after September 1, 2013. *See Sisoian v. Int'l Bus. Machines Corp.*, No. A-14-CA-565-SS, 2014 WL 4161577, at *2 n.4 (W.D. Tex. Aug. 18, 2014) (concluding that "because the misappropriation in this case occurred years before September 2013, TUTSA is not available as a mechanism for [plaintiff]").

Because the NDA's non-use provision expired on December 11, 2012,[64] the NDA cannot serve as the basis for a TUTSA violation.  Other than the NDA, WWCS has not plausibly alleged the existence of any confidential relationship that might impose on defendants a non-use duty--much less one that existed as of September 1, 2013.  Thus, WWCS has failed to adequately plead that defendants committed "misappropriation" under the meaning of TUTSA at a time when the law was in effect.  WWCS's TUTSA claim is dismissed.

### C.   WWCS's Trade Secret Misappropriation Claim Under LUTSA

WWCS also pleads a claim for trade secret misappropriation against Oceaneering and Mancini under the Louisiana Uniform Trade Secrets Act (LUTSA).  Like its Texas counterpart, LUTSA permits a complainant to recover damages for actual loss caused by the misappropriation of a trade secret.  *See*

---

[64] Section III.A.3 *supra*.

La. Rev. Stat. § 51:1431.  Indeed, the operative provisions of the two Uniform Trade Secrets Act enactments are virtually identical.  *Compare* La. Rev. Stat. 51:1431(2) *with* Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3).  Defendants make two arguments for dismissal of WWCS's LUTSA claim.  The Court addresses each in turn.

### 1.   *The Choice of Law Argument*

First, defendants contend that Texas law alone governs WWCS's trade secret claims because those claims arise out of the NDA, which includes a provision selecting Texas law.  Defendants argue that WWCS's attempt to invoke LUTSA, a Louisiana statute, must therefore fail.  WWCS contends that the NDA's choice of law provision applies only to contract claims and does not apply to claims that sound in tort.[65]

As noted, the NDA's choice of law provision provides:  "This agreement is made subject to and shall be construed under the laws of the State of Texas (excluding its conflicts-of-laws principles)."[66]   The Court has already concluded that this provision is enforceable as written under Louisiana law.[67]

---

[65] *Compare* R. Doc. 41-3 at 4 *with* R. Doc. 52 at 21.

[66] R. Doc. 41-3 at 3.

[67] Section III.A *supra*.

The harder question is whether the NDA's choice of law encompasses any of WWCS's claims that sound in tort, rather than in contract.

This question raises its own choice of law issues. As the Second Circuit Court of Appeals has noted, "determining which jurisdiction's law governs the scope of a valid choice-of-law clause is not a simple matter." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 332 (2d Cir. 2005). Some jurisdictions have concluded that the scope of a choice of law provision is a matter of contract interpretation subject to the law chosen by that provision. *Id.* at 333; *see also Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032 (Del. Ch.) *aff'd*, 894 A.2d 407 (Del. 2005) (concluding that, as "a matter of hornbook law," the scope of a choice of law provision is determined under the law that the provision selects). Other courts determine the provision's scope under the same law that governs its enforcability, the law of the forum state. *Fin. One*, 414 F.3d at 332 (collecting cases); *see also Schwan's Sales Enterprises, Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 597 (8th Cir. 2007) (concluding that interpreting a choice-of-law clause's scope under the chosen law rather than the forum law would "give effect to that provision *before* the court's analytical determination of what effect it should have").

The Court need not enter this conflict. Under Fifth Circuit law, when "there are no differences between the relevant substantive laws of the

respective states, there is no conflict, and a court need not undertake a choice of law analysis." *R.R. Mgmt. Co. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005).   Upon reviewing the applicable law, the Court concludes that regardless of whether Texas or Louisiana law applies to the scope determination, the NDA's choice of law provision does not extend to WWCS's claim for trade secret misappropriation under LUTSA or any of the other extracontractual claims pleaded in the complaint.

Texas law distinguishes between choice of law provisions that refer only to the interpretation of a contract and those that refer more broadly to all disputes between the contracting parties. *See Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999).   Narrow provisions encompass only contract actions, *see e.g.*, *id.* (concluding that an employment agreement's choice of law clause did not encompass tort claims for personal injury incurred during employment); *Red Roof Inns, Inc. v. Murat Holdings, L.L.C.*, 223 S.W.3d 676, 684 (Tex. App.--Dallas 2007, *pet. denied*) (holding that a franchise agreement stating that it "will be interpreted, construed, and enforced" under Ohio law did not encompass various tort claims),   while broader ones may govern extracontractual tort claims as well. *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp. 2d 986, 989 (S.D. Tex. 2004) (concluding that clause referencing "[a]ll disputes which may arise in connection with the

performance of this Agreement" encompassed trade secret misappropriation, fraud, and other tort claims).

Louisiana law draws a similar distinction.  Choice of law provisions that refer narrowly to the contract govern only matters of contract interpretation and enforcement.  *See e.g. Gulf Coast Bank & Trust Co. v. Statesman Bus. Advisors, LLC*, 2012 WL 5199717, at *1 (E.D. La. Oct. 22, 2012) (holding that choice of law clause stating that "this Agreement shall be governed by the laws of the State of Texas" did not govern claims arising in tort); *Dorsey v. N. Life Ins. Co.*, 2005 WL 2036738, at *6 (E.D. La. Aug. 15, 2005) ("Because the choice of law provision applies only to '[t]his Agreement,' the clause does not encompass plaintiffs' tort and statutory claims. . . ."); *Foshee v. Torch Operating Co.*, 763 So. 2d 82, 89 (La. App. 3 Cir. 2000) (holding that a choice of law clause referring to how the agreement should be "governed and construed" did not require application of Louisiana law to tort immunity issue).  Provisions that use broader language may govern extracontractual tort claims as well.  *See Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 837 So. 2d 11, 42 (La. Ct. App. 1 Cir. 2002) (holding that provision that applied to "the work to be performed" encompassed fraudulent conduct claims).

32

Here, the choice of law provision refers narrowly to "the agreement" and provides that it is "subject to" and "construed under" Texas law.[68]  This language is narrow because it refers to how to interpret the contract itself; it does not purport to encompass all disputes between the parties.  Thus, Texas and Louisiana law both dictate that the NDA's choice of law does not apply to WWCS's tort claims against Oceaneering and/or Mancini.  Defendants' first argument for dismissal therefore fails.  Because the NDA does not require the application of Texas law to WWCS's extracontractual claims, WWCS is not barred from pursuing a claim for misappropriation of trade secrets under LUTSA.

### 2.    *The Prescription Argument*

Second, defendants argue that WWCS's Louisiana trade secret misappropriation claim must be dismissed as untimely.  LUTSA's prescription period provides: "An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  La. Rev. Stat. 51:1436.  It further provides that a continuing misappropriation constitutes a single claim.  *Id.*

WWCS alleges that defendants violated LUTSA by using proprietary information that they received in confidence under the NDA to design and

---

[68] R. Doc. 41-3 at 3.

construct their own hydrate remediation system.  WWCS further alleges that before July 2013, when BP awarded a hydrate remediation contract to Oceaneering, it did not know that Oceaneering was bidding against it for hydrate remediation work.  It also alleges that it was unaware of the precise methods and techniques that Oceaneering was using to bid for and complete hydrate remediation projects.  According to WWCS's complaint, because "the remediation system is utilized on Oceaneering's private boats and in several thousand feet deep in the sea [sic.] . . . there is virtually no way to discover the methods and techniques actually being used by Oceaneering until Oceanering decides to release that information."[69]  Based on these allegations, the Court finds that WWCS has plausibly pleaded that it could not reasonably have discovered defendants' misappropriation earlier than July 2013.  WWCS filed this lawsuit on May 21, 2015, which is less than two years after the alleged discovery date and well within LUTSA's three-year prescriptive period.

Defendants resist this conclusion by arguing that Oceaneering's bids for hydrate remediation contracts were not private and that its remediation work was widely known within the industry.[70]  But these arguments draw on facts not alleged in WWCS's complaint, and the Court will not them here.  *See Hall*

---

[69] R. Doc. 41 at 14-15.

[70] R. Doc. 32-1 at 16.

34

*v. Hodgkins*, 305 F. App'x 224, 227 (5th Cir. 2008) (noting that "[i]n ruling on a Rule 12(b)(6) motion to dismiss, the district court cannot look beyond the pleadings . . . and must accept[] as true those well-pleaded factual allegations in the complaint").  Because defendants have not shown that a prescriptive bar exists on the face of the pleadings, they are not entitled to dismissal of WWCS's LUTSA claim on the grounds of untimeliness.

### D.   WWCS' Claim for Fraudulent Inducement

WWCS pleads a claim for fraudulent inducement, which Oceaneering moves the Court to dismiss on the grounds that WWCS has failed to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).[71] Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The amount of particularity required for pleading fraud necessarily "differ[s] with the facts of each case." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.) *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir.1997) (noting that "Rule 9(b)'s ultimate meaning is context-specific").  Nonetheless, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the

---

[71] R. Doc. 32-1 at 41-42.

statements were made, and an explanation why they are fraudulent." *Plotkin*

*v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).  In short, the complaint

must provide "the essentials of the first paragraph of any newspaper story,

namely the who, what, when, where, and how." *Melder v. Morris*, 27 F.3d

1097, 1100 n.5 (5th Cir. 1994).

WWCS alleges that "in the NDA, and in related negotiations,"

Oceaneering represented that it would keep WWCS's proprietary information

confidential.  WWCS further alleges that these representations were both

material--because WWCS would not have shared proprietary information

without Oceaneering's assurances--and false.  According to WWCS,

"Oceaneering's acts indicate that not only did it not keep the information

confidential, but that it never intended to keep the information confidential."[72]

In sum, WWCS bases its fraudulent inducement claim on two categories of

fraudulent conduct--Oceaneering's statements during negotiations "related

[to]" the NDA and Oceaneering's execution of the NDA with the intent not to

honor its provisions.  Neither allegation satisfies Rule 9(b).

The allegation concerning contractual negotiations fails because it does

not attribute a specific fraudulent statement or omission to any particular

speaker; nor does it detail the time, place, or manner in which the alleged

---

[72] R. Doc. 41 at 12, 16, 20, 28-29.

36

fraud took place.  While WWCS does vaguely refer to a negotiation period, it does not specify who was involved in the negotiations, what was said, or when and where the key discussions took place.  Such an allegation is insufficient to satisfy the heightened pleading requirements of Rule 9(b).  *See Kelly Law Firm, P.C. v. An Attorney for You*, 679 F. Supp. 2d 755, 773 (S.D. Tex. 2009) (dismissing fraudulent inducement claim under Rule 9(b) when plaintiff's fraud allegation referred generally to a presentation but failed to specify who delivered the presentation to plaintiffs, which specific statements were fraudulent, and when, where, and how the offending statements were made); *see also United States ex rel. Richardson–Eagle, Inc. v. Marsh & McLennan Cos.*, 2005 WL 3591014, at *7 n.18 (S.D. Tex. 2005) (dismissing fraud in the inducement claim under Rule 9(b) when complaint failed to allege who was involved in contract negotiations, where or when the negotiations took place, or what was said before, during, or after the negotiations); *Patel v. Holiday Hosp. Franchising, Inc.*, 172 F.Supp.2d 821, 824 (N.D. Tex. 2001) (fraud allegations insufficient for failing to identify particular person making representations, when they were made, where and by what means they were made, whether they were oral or written, exact content of representations, or why they were fraudulent).

WWCS's allegation that Oceaneering entered the NDA with fraudulent intent is also insufficient.  As a general rule, "there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed." *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (citing *United States v. Shah*, 44 F.3d 285, 293 (5th Cir. 1995)); *see also Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858-59 (5th Cir. 2004) ("Failure to perform a contract . . . is not evidence of fraud.").  Fraud may be inferred when "substantial nonperformance is coupled with other probative factors, such as where only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances. . . ." *Id.*  But the burden is on the plaintiff to "set forth *specific facts* that support" the inference. *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 667 (5th Cir. 2004) (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir.1994)).

Here, the facts alleged by WWCS do not support an inference that Oceaneering entered the NDA with fraudulent intent.  Although WWCS claims that Oceaneering committed numerous breaches of the NDA, it provides little information on when the misconduct actually occurred.  The complaint's only specific allegation in this regard is that "Oceaneering was potentially

38

developing drawings based on WWC's information as early as March 1, 2010."

But March 2010 was three months after the parties executed the NDA.

Further, the use of the word "potentially" is tantamount to alleging that this

conduct was possible with no specific facts to suggest that the use was actually

occurring at this time.  Moreover, other facts in WWCS's complaint indicate

that various factors changed between the time when Oceaneering entered the

NDA and its alleged misuse of proprietary information.  For instance, in early

2010, WWCS successfully demonstrated its technological innovations by

clearing hydrates from a pipeline for ATP Oil and Gas.[73]  Following the ATP

job, Oceaneering and WWCS expanded their business relationship by

beginning work on a second remediation project for Marubeni Oil and Gas.[74]

Given these intervening events, WWCS's allegations do not support an

inference that Oceaneering entered the NDA with the intent not to perform.

Because WWCS has failed to allege fraud with particularity, as required

by Rule 9(b), its fraudulent inducement claim is dismissed.

### E.    WWCS's Remaining Tort Claims

---

[73] *Id.* at 10.  Although WWCS does not specifically allege the date on which the parties cleared ATP's hydrate blockage, it does attach an to its complaint an exhibit, entitled "ATP Presentation," which indicates that the subsea separator for the project was installed on January 6, 2010.  R. Doc. 41-4 at 14.

[74] *Id.* at 11.

In addition to its breach of contract claim and its statutory claims under TUTSA and LUTSA, WWCS pleads numerous tort claims against Oceaneering and/or Mancini, including misappropriation, trade secret misappropriation, breach of a confidential relationship, tortious interference with prospective business relations, business disparagement, and unfair competition.[75] Defendants raise multiple arguments for dismissal as to each tort claim. Before the Court can evaluate the merits of these arguments, however, it must determine which state's law applies.

As noted, the NDA contains a choice of law provision. But while that provision dictates that Texas law applies to WWCS's breach of contract claim,[76] it does not govern claims that sound in tort.[77] Because the NDA is not dispositive, the Court must apply the choice of law methodology contained in Louisiana's Civil Code. Article 3542 provides that the substantive law to be applied should be "the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." La. Civ. Code art. 3542. To make this determination, courts consider "the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of

---

[75] *Id.* at 22-31.

[76] Section III.A *supra.*

[77] Section III.C.1 *supra.*

conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered," as well as "the policies of deterring wrongful conduct and of repairing the consequences of injurious acts." *Id.* In addition, courts consider "the policies referred to in Article 3515," *id.*, which include "the policies and needs of the interstate and international systems . . . ." La. Civ. Code art. 3515.

Although the choice of law determination is critical to their motion to dismiss, defendants have failed to demonstrate which law applies or to establish a factual foundation upon which the Court can rely to apply the relevant choice of law factors. The Court therefore denies defendants' motion to dismiss WWCS's remaining claims that arise in tort.

## IV.   LEAVE TO AMEND

Federal Rule of Civil Procedure 15(a)(2) instructs that the Court should "freely give" leave to amend "when justice so requires." Fed.R.Civ.P. 15(a)(2); *Leal v. McHugh*, 731 F.3d 405, 417 (5th Cir. 2013). As the Supreme Court holds, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Therefore, the Court grants WWCS's leave to amend its complaint with respect to its

41

fraudulent inducement claim within twenty-one (21) days of the entry of this order. The other dismissals are with prejudice because amendments would be futile. *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 271 (5th Cir. 2010) (holding that denial of leave to amend may be appropriate when amendment would be futile).

## V.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART defendants' motion to dismiss. Plaintiff's breach of contract claim is DISMISSED with prejudice to the extent that it rests on use of information in the patent applications or on conduct that occurred after December 11, 2012. Plaintiff's trade secret misappropriation claim under the Texas Uniform Trade Secrets Act is DISMISSED with prejudice. Plaintiff's claim for fraudulent inducement is DISMISSED without prejudice and with leave to amend within twenty-one (21) days of this order. The Court declines to dismiss plaintiff's other claims.

New Orleans, Louisiana, this <u>16th</u> day of November, 2015.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

42