UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WRIGHT'S WELL CONTROL                                    CIVIL ACTION
SERVICES, LLC

VERSUS                                                        NO. 15-1720

OCEANEERING INTERNATIONAL,                          SECTION "R" (3)
INC.


## ORDER AND REASONS

Both parties move for summary judgment on plaintiff's claim of infringement of U.S. Patent No. 8,413,725 ('725 Patent).[1] Plaintiff also moves for reconsideration of the Court's claim construction order.[2]  For the following reasons, the Court grants defendant's motion for summary judgment.  The Court denies plaintiff's motions for summary judgment and reconsideration.


I.      **BACKGROUND**

A.      **History of the '725 Patent**

Plaintiff Wright's Well Control Services, LLC (WWCS) and defendant Oceaneering International, Inc. (Oceaneering) both provide hydrate

---

[1]      R. Docs. 273, 289.
[2]      R. Doc. 326.

remediation services for the oil and gas industry. A hydrate is an ice-like solid that forms when water becomes mixed with oil and/or gas at high pressure and low temperature.[3] Hydrates can cause a pipeline to become blocked by "hydrate plugs," resulting in a loss of production.[4]

WWCS alleges that in 2008, Oceaneering tried and failed to remove hydrates from a pipeline for ATP Oil and Gas Corporation.[5] ATP then asked WWCS to review Oceaneering's work, prompting WWCS to spend 18 months researching, testing, and developing a new system for preventing and removing hydrates in deepwater environments.[6] According to WWCS, its remediation system successfully cleared hydrates from ATP's pipeline by overcoming many of the design challenges that plagued earlier systems.[7]

WWCS's hydrate remediation system utilizes a pump to reduce the pressure in the pipeline. By reducing this pressure, WWCS's system can cause solid hydrate plugs to dissociate, *i.e.*, melt, into liquid and gas.[8] But if too much gas enters the system, the gas could reduce the pumping ability of the pump or even cause the pump to implode.[9] The separator described in

---

[3]     R. Doc. 147 at 3 ¶ 12.
[4]     *Id.* at 3-4 ¶¶ 12-13.
[5]     *Id.* at 7 ¶¶ 22-23.
[6]     *Id.* ¶¶ 22, 24.
[7]     *Id.* at 5-6 ¶¶ 17-18, 33.
[8]     *Id.* at 4 ¶ 16.
[9]     *Id.* at 10 ¶ 32.

the '725 Patent solves this problem by separating gas from liquid and discharging the gas to the surface.   *See* '725 Patent at 4:47-57.

David Wright, who founded WWCS, and Jeffrey Dufrene filed Provisional Application No. 61/290,168 for their hydrate remediation system in December 2009, shortly after signing a nondisclosure agreement (NDA) with Oceaneering.[10]  This application specifically included the subsea separator.[11]  Wright and Dufrene filed non-provisional Patent Application No. 12/978,486 for the separator on December 24, 2010.[12]  They later assigned their interests in the patents to WWCS.[13]  The '725 Patent for the separator issued on April 9, 2013, and U.S. Patent No. 9,435,185 ('185 Patent) for the hydrate remediation system issued on September 6, 2016.

WWCS alleges that Oceaneering used information provided by WWCS under a nondisclosure agreement to create a subsea separator for its own Flowline Remediation System (FRS).[14]  Oceaneering has performed hydrate remediation using the FRS on multiple jobs since terminating its business

---

[10]     *Id.* at 13 ¶ 43.
[11]     *Id.*
[12]     *Id.* ¶ 44.
[13]     *Id.* ¶ 45.
[14]     *Id.* at 12 ¶ 39.

relationship with WWCS.[15]  According to WWCS, Oceaneering's FRS and separator relies on the technologies described in the '725 and '185 Patents.[16]

## B.    Procedural History

On May 21, 2015, WWCS filed its initial complaint against Oceaneering, pleading patent infringement as well as various claims under Texas and Louisiana state law.[17]  On November 16, 2015, the Court dismissed WWCS's breach of contract claim with prejudice to the extent that it rested on information in WWCS's patent applications or on conduct that occurred after December 11, 2012, and dismissed plaintiff's statutory trade secret misappropriation claim under the Texas Uniform Trade Secrets Act.[18]  After plaintiff filed a second and third amended complaint, Oceaneering moved to dismiss plaintiff's patent infringement claims.  On February 13, 2017, the Court dismissed WWCS's patent claims, but without prejudice and with leave to amend.[19]

On February 27, 2017, WWCS filed its fourth amended complaint, which is the operative complaint.[20]   The complaint asserts patent

---

[15]     *Id.* at 16-17 ¶ 58.
[16]     *Id.* at 23 ¶ 82.
[17]     R. Doc. 1.
[18]     R. Doc. 56 at 42.
[19]     R. Doc. 141 at 21.
[20]     R. Doc. 147.  WWCS has now moved for leave to file a fifth amended complaint adding David Wright as a plaintiff.  R. Doc. 330.

infringement claims, as well as claims for Texas common law misappropriation, Texas common law misappropriation of trade secrets, Louisiana statutory misappropriation of trade secrets under the Louisiana Uniform Trade Secrets Act ("LUTSA"), and Texas common law breach of contract, breach of confidential relationship, tortious interference with prospective business relations, fraudulent inducement, business disparagement, and unfair competition.[21] Oceaneering then filed two motions for partial summary judgment, arguing that several claims were time-barred. The Court granted these motions in part on August 23, 2017, dismissing WWCS's LUTSA claim and its claims for Texas common law misappropriation, Texas common law misappropriation of trade secrets, breach of confidential relationship, and business disparagement.[22] The Court also dismissed WWCS's claim for unfair competition to the extent the claim is based on misappropriation.[23] Additionally, Oceaneering moved for summary judgment against WWCS on its claim for infringement of the '185 Patent, arguing that Oceaneering had not used its FRS since the '185 Patent issued. The Court granted this motion on August 28, 2017.[24]

---

[21]   R. Doc. 147 at 36-46 ¶¶ 89-139.
[22]   R. Doc. 258.
[23]   *Id.*; *see also* R. Doc. 340 (clarifying the Court's order dated August 23, 2017).
[24]   R. Doc. 260.

After the parties briefed the disputed claim language of the '725 Patent, the Court held a claim construction hearing on October 12, 2017. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The Court issued its claim construction order on November 6, 2017.[25] Oceaneering and WWCS have now filed cross-motions for summary judgment on WWCS's claim for infringement of the '725 Patent.[26] Additionally, WWCS moves for reconsideration of the Court's claim construction order.[27]

## C.    Claims of the '725 Patent

The '725 Patent, titled "Subsea Fluid Separator," contains 20 claims, three independent and 17 dependent.   WWCS asserts infringement of independent Claim 1 and dependent Claims 11 and 12.[28]  Claim 1 is set forth below:

A subsea separator, comprising:

a housing having an inlet for receiving a fluid mixture, a non-gaseous fluid outlet located along the housing at a point lower than the inlet, and a gas outlet located along the housing at a point higher than the inlet;

baffle type members located within the housing for acting on fluid entering the housing; and

---

[25]    R. Doc. 299.
[26]    R. Docs. 273, 289.
[27]    R. Doc. 326.
[28]    R. Doc. 240 at 19.

ball valve assembly located within the housing and in communication with the gas outlet for preventing non-gaseous fluid from exiting the housing through the gas outlet, the ball valve assembly being operationally configured to open and seal the gas outlet based on the volume of non-gaseous fluid within the separator;

wherein the separator is operationally configured to operate under vacuum.

'725 Patent at 9:10-10:64.

Dependent Claims 11 and 12 disclose specific variations of the separator described in independent Claim 1. Claim 11 discloses: "The separator of claim 1 further including an external frame attached thereto." *Id.* at 9:52-53. Claim 12 discloses: "The separator of claim 1 wherein the separator is operationally configured to be fluidly connected to a subsea pump via the non-gaseous fluid outlet." *Id.* at 9:54-56.

Figure 1 of the '725 Patent, showing a simplified embodiment of the separator, is reproduced below. Figure 1 labels the housing as **10**; the outer wall of the housing as **22** and the inner wall as **24**; the inlet as **14**; the non-gaseous outlet as **20**; the gas outlet as **18**; the baffle type members as **16**; and a perforated tube (part of a ball valve assembly) as **30**.



*Figure 1*

In its claim construction order, the Court construed a number of terms in Claims 1, 11, and 12. Most importantly for purposes of the parties' motions, the Court held that the "ball valve assembly" **30** features a ball that opens or closes the gas outlet based on the volume of non-gaseous fluid within the separator, operates without external intervention, and is located inside the housing . The Court further held that the "baffle type members" **16** are plate-

like structures that change the flow of a fluid, and are also located inside the housing.

## II.    DISCUSSION

### A.    Motion for Reconsideration

A district court has considerable discretion to grant or deny a motion for reconsideration under Federal Rule of Civil Procedure 59(e). *See Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993).   But "reconsideration of a previous order is an extraordinary remedy which should be used sparingly." *Fields v. Pool Offshore, Inc.*, 1998 WL 43217, at *2 (E.D. La. Feb. 3, 1998); *see also Bardwell v. George G. Sharp, Inc.*, 1995 WL 517120, at *1 (E.D. La. Aug. 30, 1995).  The Court must "strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co.*, 6 F.3d at 355.  A moving party must satisfy at least one of the following criteria to prevail on a Rule 59(e) motion: (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is necessary in order to prevent manifest injustice; and (4) the motion is justified by an intervening change in the controlling law. *See Fid. & Deposit Co. of Md. v. Omni Bank*,

1999 WL 970526, at *3 (E.D. La. Oct. 21, 1999); *Fields*, 1998 WL 43217, at *2; *see also Compass Tech., Inc. v. Tseng Labs., Inc.*, 71 F.3d 1125, 1130 (3d Cir. 1995) ("Rule 59 and Rule 60(b)(2) share the same standard for granting relief on the basis of newly discovered evidence.").

In its motion for consideration, WWCS asserts that the Court committed manifest errors of law in construing "baffle type members" and "ball valve assembly." WWCS first challenges the Court's conclusion that a person of ordinary skill in the art would understand the baffle type members as *plate-like* structures.[29] Specifically, WWCS argues that the Court's construction improperly imports a limitation from the specification. WWCS further argues that the Court's use of technical dictionaries was improper, both because the dictionaries contradict the intrinsic evidence, and because "baffle type members" is not ambiguous in light of the intrinsic evidence.

These arguments do not reveal a manifest error of law committed by the Court in construing baffle type members. First, the Court did not import a limitation from the specification. Instead, the Court read the claim language in light of the specification. This was not only proper under Federal Circuit precedent—it was required. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) ("[C]laims 'must be read in view of the

---

[29]    R. Doc. 326-1 at 3-6.

10

specification, of which they are a part.'" (quoting *Markman*, 52 F.3d at 979)). The specification refers to baffle type members only once, stating that "a suitable deflector means may include a *baffle type member or other plate type member* extending from the inner surface of the separator." '725 Patent at 8:7-9 (emphasis added). As a matter of ordinary English usage, this language clearly suggests that baffle type members are a subset of plate type members.

Second, the technical dictionaries do not contradict the intrinsic evidence. To the contrary, both technical dictionaries cited by the Court define baffles in separators as plates. *See* Norman J. Hyne, *Dictionary of Petroleum Exploration, Drilling & Production* 31 (2d ed. 2014); George E. King Eng'g, *5000 Oilfield Terms: A Glossary of Petroleum Engineering Terms, Abbreviations and Acronyms* (2010). Third, the Court did not err in consulting the technical dictionaries. The Federal Circuit has approved of consideration of such evidence "if the court deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52 F.3d at 980).

WWCS next challenges the Court's conclusion that a person of ordinary skill in the art would understand the ball valve assembly as operating without

external intervention.[30]  WWCS argues that the Court improperly imported this "negative limitation" from an unknown source.  WWCS further argues that if the Court imported this limitation from the primary embodiment in the specification, that too was error.

WWCS's arguments do not reveal a manifest error of law by the Court in construing ball valve assembly.  The Court first notes that its construction is not a "negative limitation," as WWCS argues.  Instead, the Court construed the ball valve assembly as *operating* without external intervention, *i.e.*, mechanically or automatically.  The Court based its construction on the claim language itself.   Claim 1 describes the ball valve assembly as "being operationally configured to open and seal the gas outlet *based on the volume of non-gaseous fluid within the separator.*"   '725 Patent at 9:20-22 (emphasis added).  A component that required external intervention to open and close the gas outlet would render superfluous the "based on" limitation. Federal Circuit precedent disfavors "interpretations that render some portion of the claim language superfluous." *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016).  Moreover, the Court cited the specification in this context only to confirm that the primary embodiment of the separator features a ball valve assembly that operates

---

30    R. Doc. 326-1 at 6-9.

mechanically. For these reasons, the Court declines to reconsider its claim construction order.

## B. Oceaneering's Motion for Summary Judgment

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

Oceaneering argues in its motion for summary judgment that WWCS cannot show either literal infringement or infringement under the doctrine of equivalents because Oceaneering's FRS lacks a ball valve assembly within the separator housing.[31] Because Oceaneering is entitled summary judgment on this ground, the Court need not address WWCS's cross-motion for summary judgment.

### 1.    *Literal Infringement*

The Court first addresses literal infringement. A finding of literal infringement requires a patentee to show "that each and every limitation set forth in a claim appear[s] in an accused product." *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004). Infringement is a question of fact. *Id.* at 1376. Summary judgment on the issue of literal infringement is appropriate "only 'when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device.'" *Id.* (quoting *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001)); *Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005) (same).

---

[31]     R. Doc. 273-1 at 9-15.

Claim 1 of the '725 Patent describes a "ball valve assembly located within the housing and in communication with the gas outlet for preventing non-gaseous fluid from exiting the housing through the gas outlet, the ball valve assembly being operationally configured to open and seal the gas outlet based on the volume of non-gaseous fluid within the separator." '725 Patent at 9:17-22. In its claim construction order, the Court explained that the ball valve assembly features a ball that opens or closes the gas outlet based on the volume of non-gaseous fluid within the separator and that operates without external intervention.[32] The Court further explained that the ball valve assembly is located inside the housing,[33] which the Court construed as an enclosed vessel, or an enclosed structure with an interior chamber.[34] Finally, the court explained that the interior of the ball valve assembly opens into the gas outlet.[35]

Although Oceaneering concedes that its separator features a ball valve,[36] there is no genuine dispute that Oceaneering's ball valve assembly lacks two limitations recited in Claim 1 of the '725 Patent: that the ball valve

---

[32] R. Doc. 299 at 31.
[33] *Id.* at 33.
[34] *Id.* at 16. The housing also includes an inlet and two outlets. '725 Patent at 9:11-14.
[35] R. Doc. 299 at 34.
[36] R. Doc. 314-4 at 3.

assembly be located inside the housing, and that it operate without external intervention.

Before addressing these specific limitations, the Court first describes Oceaneering's separator. Drawings submitted by the parties show that the main body of Oceaneering's separator comprises five vertical tubes **1** that are connected, at each end, by two horizontal tubes **2**.[37]



*Figure 2*

---

[37]     R. Doc. 289-24 at 24-25; R. Doc. 315-3 at 30.

The tubes appear to be welded together.[38]  There is an inlet located on one of the vertical tubes, a liquid outlet on the lower horizontal tube, and a gas outlet **3/4** on the higher horizontal tube.[39]  The gas outlet is connected to a duct **5**, or pipe, that appears to be several feet in length.  The duct leads to a chamber enclosing a ball valve **6/7**.  Oceaneering's ball valve is a traditional ball valve, defined by a technical dictionary as "a valve that opens with a quarter turn by rotating a ball with a hole through it located in a spherical container."[40]  Hyne, *supra*, at 33.  When the ball valve is open, gas is vented out of the separator.[41]

Additionally, one of the vertical tubes is connected to a transducer, which Oceaneering employee Troy Mills describes as "a volume gauge comprising an electronic float that moves up and down on a sensor rod based on the volume of liquid in the separator.  The transducer sends a signal topside to an operator who monitors the volume of fluid in the separator."[42]  When the liquid rises to a certain level, the topside operator directs a

---

[38]    R. Doc. 315-3 at 24-25.  These drawings provide assembly instructions for the separator.  The tubes and their attached flanges are depicted as one component, called the manifold main.  This main component's flanges are mechanically connected to other components.

[39]    R. Doc. 315-3 at 27.

[40]    R. Doc. 314-2 at 4; R. Doc. 273-6 at 4.

[41]    R. Doc. 287-25 at 8-9.

[42]    R. Doc. 315-3 at 4.

remotely operated vehicle (ROV) to close the ball valve through the ROV interface **8**.[43]

### a. *Within the housing*

The Court now turns to the specific limitations that are not present in Oceaneering's separator. First, there is no genuine dispute that Oceaneering's ball valve assembly is located outside the separator housing. The ball valve itself is not located in any of the tubes that comprise the main body of Oceaneering's separator. Instead, the ball valve is connected to the higher horizontal tube by a duct that is several feet long. Thus, no reasonable juror would find that the ball valve is located inside the tubes that comprise the main body of Oceaneering's separator.

To resist the conclusion that Oceaneering's ball valve is not located inside the housing, WWCS argues that the housing actually extends beyond the tubes that comprise the main body of the separator.[44] This argument is inconsistent with the Court's construction of "housing" as an enclosed vessel, or an enclosed structure with an interior chamber. The tubes in Oceaneering's separator are welded together and create an enclosed structure. This structure includes the inlet and the gas and liquid outlets,

---

[43]    R. Doc. 287-25 at 14.
[44]    R. Doc. 287 at 6.

which are flanges attached to the tubes.[45] *Cf. Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1278 (Fed. Cir. 1995) (holding that the housing of a light fixture included flanges). But the chamber enclosing the ball valve is a separate structure, connected by a duct to the higher horizontal tube.[46] Schematics of Oceaneering's separator do not even depict the ball valve.[47] Thus, no reasonable juror would find that the main body of the separator and the ball valve chamber together form one enclosed vessel, or an enclosed structure with an interior chamber.

Further, the inventors disclaimed WWCS's broader construction before the PTO. "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). The inventors' initial application described a sealing means in communication with the gas outlet and operationally configured to open and seal the gas outlet based on the volume of liquid within the separator.[48] The PTO rejected this limitation as disclosed by prior art—

---

[45] *See* R. Doc. 315-3 at 27.
[46] *See id.* at 29-31.
[47] *Id.* at 26-28.
[48] R. Doc. 273-4 at 3.

specifically, U.S. Patent No. 5,082,556, which the prosecution history refers to by the name of the inventor, Reese.[49]  As shown below, the chamber enclosing the ball valve assembly **36** in Reese is located completely outside the housing **10**, and the two components are connected by a duct **24**.[50]



*Figure 3*

The inventors distinguished their separator from prior art by placing the ball valve assembly within the housing.[51]  WWCS cannot now expand the scope

---

[49]    R. Doc. 287-6 at 128-29.
[50]    R. Doc. 299 at 32-33; *see also* R. Doc. 314-3 at 2.
[51]    R. Doc. 273-4 at 15.

of its patent to cover what it earlier disclaimed—namely, a separator in which the ball valve assembly is connected by a duct to the main body of the separator.

WWCS relies on the opinion of its expert, Benton Baugh, who states that the housing includes all components that are pressure tested.[52]  In doing so, WWCS essentially seeks to reconstrue "housing."  WWCS did not offer this argument in its claim construction brief.  Moreover, Baugh does not provide any basis for his opinion that Oceaneering's ball valve is pressure tested.  Nor does he explain why the ball valve chamber is included in the housing, but other components in Oceaneering's FRS—such as the pump—are not.  Baugh's expert report therefore fails to raise a genuine dispute as to whether Oceaneering's ball valve assembly is located within the housing.

WWCS also argues that the transducer is both part of the ball valve assembly and located within the housing.  But the transducer is not even connected to the ball valve.[53]  Even if it were, no reasonable juror would find that it is inside the housing as construed by the Court.  Like the ball valve chamber, the transducer is structurally distinct from the tubes that comprise the main body of Oceaneering's separator.[54]  The drawing below depicts the

---

[52]     R. Doc. 289-24 at 28-29.
[53]     R. Doc. 315-3 at 4.
[54]     *See* R. Doc. 273-7 at 19.

transducer as a smaller vertical tube, connected to one of the larger vertical tubes by flanges.



*Figure 4*

Because the transducer and the main body of the separator are distinct structures, no reasonable juror would find that the transducer is located inside the housing.

### b. *Operationally configured to open and seal the gas outlet based on the volume of non-gaseous fluid within the separator*

The second limitation not present in Oceaneering's ball valve assembly is the capability to operate without external intervention. Viewing the record in the light most favorable to WWCS, there is evidence that Oceaneering's ball valve assembly operates without human intervention. Specifically,

former Oceaneering employee Wayne Huddleston stated in a deposition that if the liquid rose to certain level in the transducer, the transducer would send a signal to a computer, which was programmed to close the ball valve.[55] But there no evidence that the computer itself is part of the separator. To the contrary, Oceaneering employee Troy Mills states in an affidavit that a topside operator controls the ball valve.[56] Mills further states that the transducer is not connected, either mechanically or electronically, to the ball valve.[57] Thus, there is no genuine dispute that Oceaneering's ball valve requires external intervention—namely, a topside computer—to open or seal the gas outlet.

Because Oceaneering's separator does not satisfy each limitation of Claim 1 of the '725 Patent, and because Claims 11 and 12 depend on Claim 1, Oceaneering's separator does not literally infringe on the '725 Patent, and Oceaneering is entitled summary judgment on the issue of literal infringement.

### 2. *Doctrine of Equivalents*

The doctrine of equivalents permits a patentee to establish infringement "if there is equivalence between the elements of the accused

---

[55] R. Doc. 287-25 at 14.
[56] R. Doc. 315-3 at 4.
[57] *Id.*

product or process and the claimed elements of the patented invention." *Intendis GMBH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1360 (Fed. Cir. 2016) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997)). In other words, the doctrine "allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002). As with literal infringement, infringement under the doctrine of equivalents requires that the allegedly infringing product contain each limitation or its equivalent. *Aquatex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (citing *Warner-Jenkinson*, 520 U.S. at 40).

The application of the doctrine of equivalents can be foreclosed by prosecution history estoppel. Prosecution history estoppel renders the doctrine of equivalents inapplicable to subject matter that is "relinquished when a patent claim is narrowed during prosecution." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006). While a narrowing amendment "may be presumed to be a general disclaimer of the territory between the original claim and the amended claim," a patentee may rebut this presumption by showing that (i) the equivalent in question was unforeseeable at the time of the amendment; (ii) the rationale for the

amendment is related only tangentially to the equivalent in question; or (iii) there is "some other reason" why the patentee could not be expected to describe the equivalent in question. *Festo*, 535 U.S. at 740-41.

Here, prosecution history estoppel bars application of the doctrine of equivalents to the limitation that the ball valve assembly be located within the housing. As explained earlier, the inventors narrowed Claim 1 to include only a ball valve assembly that is located within the housing. They made this narrowing amendment to distinguish their separator from Reese, in which the ball valve assembly was connected by a duct to the main body of the separator.[58] This narrowing amendment gives rise to the presumption that the inventors relinquished the territory between the original claim, *i.e.*, the location of the ball valve assembly as described in Reese, and the amended claim. *See Duramed Pharm., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011) (noting that "a presumption of prosecution history estoppel applies" to a narrowing amendment made "in response to a prior art rejection"). WWCS does not attempt to rebut this presumption. There is no genuine dispute, therefore, that prosecution history estoppel bars WWCS from asserting equivalence with respect to Claim 1's limitation that the ball valve assembly be located within the housing. Accordingly, Oceaneering is

---

[58]     R. Doc. 273-4 at 15.

entitled summary judgment on the issue of infringement under the doctrine of equivalents.

## III.  CONCLUSION

For the foregoing reasons, the Court GRANTS Oceaneering's motion for summary judgment on WWCS's patent infringement claim, and DENIES WWCS's motion for reconsideration and its cross-motion for summary judgment.  WWCS's claim for infringement of the '725 Patent is DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this __22nd__ day of January, 2018.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE