WRIGHT'S WELL CONTROL                                CIVIL ACTION
SERVICES, LLC

VERSUS                                                      NO. 15-1720

OCEANEERING INTERNATIONAL,                    SECTION "R" (3)
INC.

## ORDER AND REASONS

Defendant Oceaneering International, Inc. moves for summary judgment on several of plaintiff's state law claims.[1]  For the following reasons, the motion is granted in part and denied in part.

## I.      BACKGROUND

Plaintiff Wright's Well Control Services, LLC (WWCS) and defendant Oceaneering International, Inc. (Oceaneering) both provide hydrate remediation services for the oil and gas industry.  A hydrate is an ice-like solid that forms when water becomes mixed with oil and/or gas at high

---

[1]      R. Doc. 266.

pressure and low temperature.[2]  Hydrates can cause a pipeline to become blocked by "hydrate plugs," resulting in a loss of production.[3]

## A.  The Parties' Initial Hydrate Remediation Efforts

In 2008, ATP Oil and Gas Corporation contracted with Oceaneering to remove hydrates from a pipeline (Canyon Express project).[4]  At the time, Oceaneering had a hydrate remediation skid designed to clear hydrate plugs in smaller tubing; Oceaneering had not yet used it on a pipeline.[5]  This hydrate remediation skid featured a low-volume pump, and was fitted onto and powered by a remotely operated vehicle (ROV).[6]  Oceaneering successfully cleared some, but not all, of the hydrate plugs from ATP's pipeline in early 2009.[7]  Oceaneering's hydrate remediation skid also suffered various problems because of the presence of gas in the system, such as reduction in pumping capability and formation of hydrates in tubing connected to the skid.[8]  Oceaneering employees began discussing potential improvements to the hydrate remediation skid as early as February 2009.[9]

---

[2]     R. Doc. 147 at 3 ¶ 12.
[3]     *Id.* at 3-4 ¶¶ 12-13.
[4]     *Id.* at 7 ¶¶ 22-23.
[5]     *See* R. Doc. 300-10 at 13-14; R. Doc. 300-46 at 4.
[6]     R. Doc. 300-10 at 13-14; R. Doc. 300-15 at 4.
[7]     R. Doc. 300-12 at 11.
[8]     R. Doc. 300-10 at 3; R. Doc. 300-12 at 16; R. Doc. 300-15 at 4; R. Doc. 300-84.
[9]     R. Doc. 266-37 at 2.

ATP then contracted with WWCS to conduct further hydrate remediation in ATP's pipeline (Kings Peak project), even though WWCS did not yet have a complete hydrate remediation system.[10] WWCS developed its hydrate remediation system specifically for high-volume, deepwater applications, like ATP's pipeline.[11] WWCS's system, later patented, used a pump with a much higher displacement rate than the pump used in Oceaneering's skid.[12] This pump included a drill motor powered by pressurized seawater. *See generally* U.S. Patent No. 9,435,185 ('185 Patent). WWCS also designed a separator to remove gas from the system and discharge it to the surface.[13]

WWCS worked with various entities in developing its hydrate remediation system. First, Gulf Coast Manufacturing (GCM) participated in the design of the system and built most of its components.[14] Indeed, Jeffrey Dufrene, a GCM employee, is listed as a co-inventor along with WWCS's David Wright on WWCS's two patents. *See* U.S. Patent No. 8,413,725 (describing a subsea fluid separator); '185 Patent (describing a subsea

---

[10]   R. Doc. 300-12 at 6-15.
[11]   *See id.* at 7-8; R. Doc. 300-13 at 3.
[12]   *See* R. Doc. 300-15 at 5 (comparing Oceaneering's skid and WWCS's system).
[13]   *See* R. Doc. 300-13 at 4; R. Doc. 300-15 at 5.
[14]   R. Doc. 266-35 at 2; R. Doc. 300-1 at 2; R. Doc. 300-13 at 7-8.

technique for promoting fluid flow). Second, Bayou Land engineered and built the sealing units, and performed machine work.[15] Third, Keystone Engineering, SRC Engineers, Inc., and ATP itself provided engineering assistance.[16] Finally, Oceaneering built a methanol injection panel, various connectors, and emergency quick disconnects for the Kings Peak project.[17] WWCS also worked with Oceaneering.[18]

## B.   The Nondisclosure Agreement

On December 11, 2009, WWCS and Oceaneering allegedly executed a Reciprocal Nondisclosure of Confidential and Proprietary Information Agreement (NDA).

The NDA's introductory section states: "It is the intention of the parties to this Agreement to exchange proprietary information. The disclosure and use of any proprietary data shall be governed in accordance with the following . . . ." Section One defines the "information" that is covered by the NDA:

> For the purpose of this Agreement, confidential and proprietary information "Information" shall be defined as but not limited to, performance, sales, financial, contractual, and special marketing information, ideas, technical data, all intellectual property including inventions, patents, pending patents and all other

---

[15]   R. Doc. 266-35 at 3; R. Doc. 300-1 at 2.
[16]   R. Doc. 266-35 at 2; R. Doc. 300-1 at 2; R. Doc. 300-13 at 8-9.
[17]   R. Doc. 266-35 at 3; R. Doc. 300-1 at 3.
[18]   *See, e.g.*, R. Doc. 266-37 at 3-4.

business, technical and financial information that the Disclosing Party develops, learns or obtains during the period over which it is (or is supposed to be) providing services as contracted for between the parties that relate to Recipient Party or the business or demonstrably anticipated business of the Recipient Party, or that are received by or for Recipient Party in confidence and concepts originated by the Disclosing Party. Proprietary information is further defined as data not previously available to the Receiving Party or others without restriction, nor normally furnished to others without compensation, and which the Disclosing Party desires to protect against unrestricted disclosure or competitive use, and which is furnished pursuant to this Agreement and appropriately identified as being proprietary when furnished.

Two provisions restrict a recipient's use of disclosed information. Section Two states: "With respect to all proprietary information disclosed hereunder, the Recipient Party agrees that for a period of three (3) years following the date of this Agreement, unless terminated sooner by either party, such party shall not . . . [u]se such information except for purposes of its business relationship with the Disclosing party." Section Four provides: "Neither party shall divulge or use any proprietary information disclosed to it hereunder by the other party for any purpose not connected with the effort contemplated by the Agreement."

Section Six places limits on a recipient's duty to protect and handle information. It provides, in relevant part:

The obligation with respect to the protection and handling of proprietary information, as set forth in this Agreement, is not applicable to the following:

5

a) Information which is or becomes lawfully known or available to the receiving party without restriction from a source other than the Disclosing Party.

b) Information which is or later falls within, the public domain without breach of this Agreement by the recipient.

c) Information disclosed by the Disclosing Party to others on a nonrestrictive basis.[19]

### C.    WWCS's Patents

David Wright, who founded WWCS, and Jeffrey Dufrene filed Provisional Application No. 61/290,168 for their hydrate remediation system in December 2009, shortly after signing the NDA with Oceaneering.[20] This application specifically included the subsea separator.[21] Wright and Dufrene filed non-provisional Patent Application No. 12/978,486 for the separator on December 24, 2010.[22] These patent applications were published on June 30, 2011. Wright and Dufrene later assigned their interests in the patents to WWCS.[23] The '725 Patent for the separator issued on April 9, 2013, and U.S. Patent No. 9,435,185 ('185 Patent) for the hydrate remediation system issued on September 6, 2016.

---

[19]    R. Doc. 266-3.
[20]    R. Doc. 147 at 13 ¶ 43.
[21]    *Id.*
[22]    *Id.* ¶ 44.
[23]    *Id.* ¶ 45.

The principal independent claim of the '185 Patent is a method of recovering a pipeline fluid from a source located in a subsea environment by connecting a fluid-powered motor and a pump to the source of the fluid. '185 Patent at 19:58-20:18. A drawing of a simplified embodiment of the system **10** is reproduced below. *See id.* fig. 9. Figure 1 labels the fluid source (a subsea pipeline) as **12**; the separator as **20**; the pump as **18**; the drill motor as **16**; and the emergency quick disconnects as **80**. Lines **21A** and **21B** convey pressurized seawater from the vessel to the motor; gas from the separator rises to the surface through line **23**, while liquid from the separator is directed to the vessel through line **22**; and methane may be introduced into the system through line **92**.



*Figure 1*

A simplified embodiment of the separator is reproduced below. *See* '725 Patent fig. 1. Figure 2 labels the housing as **10**; the outer wall of the housing as **22** and the inner wall as **24**; the inlet as **14**; the non-gaseous outlet as **20**; the gas outlet as **18**; the baffle type members as **16**; and a perforated tube (part of a ball valve assembly) as **30**.



*Figure 2*

### D. The Parties' Working Relationship and Oceaneering's Alleged Misuse of WWCS's Confidential Information

The parties worked together on the Kings Peak project for ATP in late 2009 and early 2010. While WWCS designed the hydrate remediation system itself and provided most of its components, Oceaneering provided support and project management.[24] WWCS's system successfully cleared the remaining hydrates in ATP's pipeline by March 2010.[25]

The parties worked together on several additional jobs using WWCS's system. Shortly after completing the Kings Peak project, WWCS and Oceaneering performed hydrate remediation for Williams Field Services Gulf Coast Company, L.P. (Williams job).[26] The parties later performed hydrate remediation for Marubeni Oil & Gas (Marubeni job)[27] and worked on another project for ATP.[28] Because of Oceaneering's working relationship with WWCS, Oceaneering had access to designs of WWCS's system and numerous operational details.[29]

---

[24]   R. Doc. 300-10 at 4.
[25]   R. Doc. 300-15 at 5.
[26]   *See* R. Doc. 128, 134.
[27]   *See* R. Doc. 300-74.
[28]   *See* R. Doc. 300-13 at 34; R. Doc. 300-51.
[29]   *See generally* R. Doc. 300-39 at 59-77; R. Doc. 300-43 at 196-201; R. Doc. 300-66 at 4-12.

While the parties were working together on these jobs using WWCS's hydrate remediation system, Oceaneering was developing its own Flowline Remediation System (FRS). Oceaneering completed a draft functional specification of the FRS in January 2010.[30] Like WWCS's hydrate remediation system, Oceaneering's FRS was designed to pump high volumes of fluid through a separator.[31] Oceaneering has performed hydrate remediation using the FRS on multiple jobs since 2012.[32]

WWCS asserts that Oceaneering developed the FRS using confidential information disclosed under the NDA.[33] According to WWCS, Oceaneering's FRS and separator rely on the technologies described in the '725 and '185 Patents.[34] WWCS further contends that Oceaneering benefitted from information about how WWCS's hydrate remediation system operates in practice.[35]

Additionally, WWCS alleges that Oceaneering made false and misleading statements about WWCS to a potential client.[36] WWCS and Oceaneering both bid for a hydrate remediation job on a BP pipeline

---

[30] R. Doc. 300-43 at 11.
[31] *See id.* at 81.
[32] *See* R. Doc. 300 at 26.
[33] R. Doc. 147 at 12 ¶ 39.
[34] *Id.* at 23 ¶ 82.
[35] *See* R. Doc. 300 at 32-33.
[36] R. Doc. 147 at 43 ¶ 126.

(Thunder Horse Restriction project).[37]  According to WWCS, BP awarded the project to Oceaneering in July 2013 after Oceaneering used WWCS's designs without permission and maligned WWCS's safety record.[38]

### E.    Procedural History

On May 21, 2015, WWCS filed its initial complaint against Oceaneering, pleading patent infringement as well as various claims under Texas and Louisiana state law.[39]  On November 16, 2015, the Court dismissed WWCS's breach of contract claim with prejudice to the extent that it rested on information in WWCS's patent applications or on conduct that occurred after December 11, 2012, and dismissed plaintiff's statutory trade secret misappropriation claim under the Texas Uniform Trade Secrets Act.[40]  After plaintiff filed a second and third amended complaint, Oceaneering moved to dismiss plaintiff's patent infringement claims.  On February 13, 2017, the Court dismissed WWCS's patent claims, but without prejudice and with leave to amend.[41]

---

[37]    *Id.* at 14 ¶¶ 48-49.
[38]    R. Doc. 300-53 at 5, 8; R. Doc. 300-113.
[39]    R. Doc. 1.
[40]    R. Doc. 56 at 42.
[41]    R. Doc. 141 at 21.

On February 27, 2017, WWCS filed its fourth amended complaint, which is the operative complaint.[42]   The complaint asserts patent infringement claims, as well as claims for Texas common law misappropriation, Texas common law misappropriation of trade secrets, Louisiana statutory misappropriation of trade secrets under the Louisiana Uniform Trade Secrets Act (LUTSA), and Texas common law breach of contract, breach of confidential relationship, tortious interference with prospective business relations, fraudulent inducement, business disparagement, and unfair competition.[43]   On August 23, 2017, the Court dismissed WWCS's LUTSA claim and its claims for Texas common law misappropriation, Texas common law misappropriation of trade secrets, breach of confidential relationship, and business disparagement as untimely.[44]  The Court also dismissed WWCS's claim for unfair competition to the extent the claim is based on misappropriation.[45]   Additionally, on August 28, 2017, the Court dismissed WWCS's claim for infringement of the

---

[42]    R. Doc. 147.
[43]    R. Doc. 147 at 36-46 ¶¶ 89-139.
[44]    R. Doc. 258.
[45]    *Id.*; *see also* R. Doc. 340 (clarifying the Court's order dated August 23, 2017).

12

'185 Patent because Oceaneering had not used the FRS since the '185 Patent issued.[46]

After the parties briefed the disputed claim language of the '725 Patent, the Court held a claim construction hearing on October 12, 2017. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The Court issued its claim construction order on November 6, 2017.[47] On January 22, 2018, the Court dismissed WWCS's claim for infringement of the '725 Patent.[48] Oceaneering now moves for summary judgment on WWCS's breach of contract, fraudulent inducement, and tortious interference claims.[49]

## II. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069,

---

[46] R. Doc. 260.

[47] R. Doc. 299.

[48] R. Doc. 343.

[49] R. Doc. 266. In addition to filing an opposition, WWCS has filed evidentiary objections to Oceaneering's motion. R. Doc. 291. Because these objections are immaterial to the Court's resolution of Oceaneering's motion, the Court need not address them, and they are denied without prejudice.

1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991).  The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's

evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A. Breach of Contract

WWCS asserts that Oceaneering breached the December 2009 NDA by using confidential information for its own benefit, without WWCS's

permission.[50]   Specifically, according to WWCS, Oceaneering used confidential information about WWCS's hydrate remediation system to create the FRS.[51]  Although Oceaneering contends that the NDA is not a valid contract because WWCS never executed it,[52] Oceaneering limits its argument to whether it breached the NDA.   Specifically, Oceaneering argues in its motion for summary judgment that the NDA does not protect the information Oceaneering allegedly misused.  According to Oceaneering, each piece of information it allegedly stole from WWCS either is in the public domain, was disclosed to third parties on an unrestrictive basis, or was disclosed to Oceaneering before the NDA came into effect.[53]   WWCS argues that information in these three categories is not excluded by the NDA.[54]  WWCS further argues that Oceaneering misused information not included in any of those three categories—namely, knowledge of how WWCS's system works in practice, which Oceaneering obtained after the NDA was executed and which was never disclosed to third parties or the public.[55]   The Court addresses each category of information in turn.

---

[50]    R. Doc. 147 at 41-42 ¶¶ 113-16.
[51]    R. Doc. 300 at 4.
[52]    R. Doc. 266-36 at 11.
[53]    *See id.* at 10-11.
[54]    R. Doc. 300 at 30-32, 33-39, 41-42.
[55]    *Id.* at 17-18, 21, 23-25, 32-33, 41-42.

16

Under Texas law,[56] "[t]he elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 579 (5th Cir. 2015) (quoting *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. App. 2009)).

When interpreting a written contract under Texas law, "a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017) (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008)). "A contract is unambiguous if it can be given a definite or certain legal meaning," but ambiguous if it "is subject to two or more reasonable interpretations." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*,

---

[56] The NDA states, and the parties do not dispute, that Texas law governs. *See* R. Doc. 266-3 at 5 ("This agreement is made subject to and shall be construed under the laws of the State of Texas (excluding its conflicts-of-law principles)."); *see also* R. Doc. 56 at 12.

596 F.3d 286, 294 (5th Cir. 2010) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).

Words in a contract must be given "their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)). The Court must also "examine the entire agreement and give effect to each provision so that none is rendered meaningless." *Id.* (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). Moreover, the Texas Supreme Court has instructed "that a court should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served." *Id.* (quoting *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996)).

### 1.    *Information in the Public Domain*

First, the Court has already held that the NDA does not cover any information in the public domain.[57] The Court based this holding on Section Six, subsection (b), of the NDA, which states that "[t]he obligation with respect to the protection and handling of proprietary information . . . is not applicable to . . . [i]nformation which is within or later falls within, the public

---

[57]    R. Doc. 56 at 20.

domain without breach of this Agreement by the recipient." Because this provision uses prospective language, the Court held, the effect of an informational item falling into the public domain is that it was never protected by the NDA at all. This is so regardless of whether Oceaneering's alleged misuse occurred before the information became public. Thus, WWCS cannot base its breach of contract claim on misuse of information that has fallen within the public domain.

Most importantly, as the Court has already held,[58] WWCS cannot rely on allegedly confidential information that is contained within WWCS's patents. *See Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 612 (5th Cir. 2011) (holding that information in patents and published patent applications is not secret under Texas trade secrets law). This information includes the use of a separator for hydrate remediation, structural details of WWCS's separator, the use of a drill motor powered by pressurized seawater, and the drawings reproduced in WWCS's patents. *See generally* '725 Patent; '185 Patent. By the same logic, WWCS also cannot rely on allegedly confidential information contained within published articles or on internet sites. Such sources include a white paper authored by

---

[58] *Id.*

WWCS employee Fernando Hernandez,[59] two presentations,[60] and three magazine articles.[61]  Thus, there is no genuine dispute that Oceaneering did not breach the NDA by misusing information now in the public domain.

## 2. *Information Disclosed to Third Parties on an Unrestrictive Basis*

Second, allegedly confidential information disclosed by WWCS to contractors and clients remains covered by the NDA.  Oceaneering's argument to the contrary is based on Section Six, subsection (c), of the NDA, which excludes "[i]nformation disclosed by the Disclosing Party [*i.e.*, WWCS] to others on a nonrestrictive basis."  Oceaneering contends that WWCS provided design and engineering information on a nonrestrictive basis to GCM, ATP, Keystone Engineering, and SRC Engineers during the development of WWCS's hydrate remediation system.[62]  Oceaneering also argues that WWCS freely provided details about its system in presentations to potential clients, including Anadarko Petroleum Corp., ConocoPhillips

---

[59]    R. Doc. 266-14 at 14-24.
[60]    R. Doc. 266-12 at 4-33; R. Doc. 266-13.
[61]    R. Doc. 266-15 at 2-4; R. Doc. 266-16; R. Doc. 266-17.
[62]    R. Doc. 266-36 at 14-15,

Co., and BP.[63]  WWCS contends that it did not provide information to these parties on a nonrestrictive basis.[64]

In construing this provision of the NDA, the Court first looks to the plain meaning of the contractual language.  *See Kachina Pipeline*, 471 S.W.3d at 450.  The ordinary meaning of "restrict" is "to confine within bounds," or "to place under restrictions as to use or distribution."  *Merriam-Webster Dictionary* Online, www.merriam-webster.com.  Thus, information disclosed on a nonrestrictive basis is information disclosed without any restrictions as to use or distribution.  Furthermore, this provision of Section Six excludes information from the scope of the NDA only *after* the information is disclosed on an unrestrictive basis.  While subsection (a) covers information that either is *or becomes* lawfully known to the receiving party, and subsection (b) covers information that either is within *or later falls within* the public domain, subsection (c) lacks any such prospective language.  It simply excludes information disclosed to others on a nonrestrictive basis.  Thus, unlike the provision of Section Six addressing information in the public domain, the provision addressing information

---

[63]    R. Doc. 266-36 at 18-19.  These presentations are attached to Oceaneering's motion as Exhibits 18, 19, and 20.  R. Docs. 266-42, 266-43, 266-45.  Unlike the presentations discussed earlier, these presentations do not appear to be within the public domain.
[64]    R. Doc. 300 at 34-35.

disclosed to other parties on a nonrestrictive basis does not apply retroactively.

This exclusion has a clear parallel in trade secrets law: voluntary disclosure destroys secrecy, but "an owner of a trade secret will not lose the secret by disclosure if he creates a duty in some manner and places that duty upon another not to disclose or use the secret." *Phillips v. Frey*, 20 F.3d 623, 630 (5th Cir. 1994). This duty need not be explicit. "[A] voluntary disclosure made within the periphery of a confidential relationship," even without an express confidentiality agreement, does not destroy the secrecy of a trade secret. *Id.* at 631; *see also Hyde Corp. v. Huffines*, 314 S.W.2d 763, 770 (Tex. 1958) ("In the area of confidential relationships between partners, employers and employees, licensors and licensees, and the like, the injured party is not required to rely upon an express agreement to hold the trade secret in confidence . . . .").

Trade secrets law also informs whether a relationship is confidential. Generally, the recipient of a trade secret owes the disclosing party a duty of confidence if "the relationship between the parties to the disclosure or the other facts surrounding the disclosure justify the conclusions that, at the time of the disclosure," the recipient "knew or had reason to know that the disclosure was intended to be in confidence," and the disclosing party "was

reasonable in inferring that the person consented to an obligation of confidentiality." Restatement (Third) of Unfair Competition § 41 (1995).

Fifth Circuit precedent suggests that a duty of confidence may arise when trade secrets are disclosed to contractors.[65]   In *Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195 (5th Cir. 1986), for example, the plaintiff disclosed technical information about a furnace design to a manufacturer, with the hope that the manufacturer would build the furnace for the plaintiff. *Id.* at 1197. The court regarded this disclosure as limited based on two policy considerations: first, the disclosure was not public, and second, "the disclosures were made to further [the plaintiff's] economic interests." *Id.* at 1200. "To hold otherwise," the court noted, "would greatly limit the [trade secret] holder's ability to profit from his secret." *Id.* Similarly, in *Taco Cabana International, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113 (5th Cir. 1991), the Fifth Circuit held that the plaintiff's disclosure of architectural plans and kitchen design drawings to a contractor "did not extinguish their secrecy." *Id.* at 1124 (citing *Fourtek*). The Court explained:

---

[65]    Oceaneering argues that the Court should apply Louisiana law to determine whether WWCS's contractors were under a duty of confidence because WWCS and its contractors are Louisiana entities. R. Doc. 308 at 8. But the NDA clearly states that it "shall be construed under the laws of the State of Texas." R. Doc. 266-3 at 4. Moreover, Oceaneering fails to explain how Louisiana law differs from Texas law in this area, and why Texas law could not also restrict the contractors' hypothetical misappropriation.

"If a voluntary disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained." *Id.* at 1124.

Based on the foregoing analysis, therefore, a jury would be entitled to find that WWCS's disclosure of technical information and designs to its contractors—GCM, Keystone Engineering, SRC Engineers, and Bayou Land—was not on a nonrestrictive basis. Additional evidence in the record supports this finding. First, WWCS and Keystone Engineering executed an NDA that expressly imposed a duty of confidence on Keystone Engineering.[66] Second, Jeffrey Dufrene of GCM testified that information about WWCS's hydrate remediation system was confidential, and that GCM took measures to protect it.[67]

Courts in the Fifth Circuit have also held that a duty of confidence may arise when trade secrets are disclosed to potential customers or buyers. In *Phillips*, for example, the plaintiff disclosed his secret manufacturing process during "the course of negotiations for the sale of a business." 20 F.3d at 632. Based on this evidence, the Fifth Circuit held, the jury was entitled to find

---

[66]    R. Doc. 300-28.
[67]    *See, e.g.*, R. Doc. 300-5 at 17-18, 33-34.

"that the defendants knew or should have known that the information was a trade secret and the disclosure was made in confidence." *Id.* Likewise, in *Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555 (S.D. Tex. 2011), the plaintiff disclosed confidential documents "to customers or potential customers in hopes of obtaining business." *Id.* at 564. The district court regarded these disclosures as limited because they "were made to further economic transactions and would not, by themselves, expose any substantive information contained in the disclosed material to the public." *Id.*

Thus, a jury would also be entitled to find that WWCS's disclosure of confidential information to customers and potential customers, such as ATP and Anadarko, was not on a nonrestrictive basis. Moreover, WWCS's presentations to potential clients were sent by email, and at least some of these email communications included a confidentiality notice.[68] For these reasons, there are genuine disputes as to whether the NDA covers confidential information disclosed to WWCS's contractors and clients.

### 3. *Information Disclosed to Oceaneering Before the NDA Was Executed*

Third, the NDA may cover information disclosed by WWCS to Oceaneering before the execution of the NDA. As Oceanering points out, the

---

[68]     *See, e.g.*, R. Doc. 266-42 at 62.

NDA lacks an explicit provision granting retroactive protection. But the NDA defines confidential information as, among other things, various types of information that "the Disclosing Party develops, learns or obtains during the period over which it is (or is supposed to be) providing services as contracted for between the parties that relate to Recipient Party or the business or demonstrably anticipated business of Recipient Party."[69] This definition covers confidential information developed by WWCS during the period when it was, or was supposed to be, providing services as contracted for between the parties—not simply during the term of the NDA. *Cf. Molina v. Air Starter Components, Inc.*, No. 01-03-00175, 2004 WL 1277491, at *6 (Tex. App. June 10, 2004) (affirming trial court's holding that NDA, which applied to "confidential information relating to or learned . . . by [employee] while in the employ of [employer]," covered information disclosed before NDA was executed). Thus, there are genuine disputes as to whether the NDA covers information disclosed by WWCS before execution of the NDA.

* * *

Oceaneering is not entitled summary judgment based on the grounds presented in its motion. But the Court does not rule on whether WWCS has introduced enough evidence to prevail on its breach of contract claim at trial.

---

[69]     R. Doc. 266-3 at 3.

Neither side has proposed a construction of what *conduct* the NDA prohibits. And neither side adequately briefs WWCS's allegations of misuse. The Court declines to interpret the NDA's language in a vacuum, without sufficient context as to Oceaneering's alleged misconduct. If the parties again move for summary judgment on WWCS's breach of contract claim, they must: (1) specifically state what WWCS information is covered by the NDA (subject to the Court's interpretations in this order); (2) propose constructions of what type of conduct is prohibited by the NDA; and (3) specifically state what conduct by Oceaneering violated the NDA.

## B.     Fraudulent Inducement and Tortious Interference

Oceaneering argues that it is entitled summary judgment on WWCS's fraudulent inducement and tortious interference claims because these claims are predicated on WWCS's meritless breach of contract claim.[70] Oceaneering's argument fails because, as explained earlier, Oceaneering is not entitled summary judgment on the breach of contract claim.

Moreover, Oceaneering's breach of the NDA is not a necessary element of WWCS's fraudulent inducement and tortious interference claims. Fraudulent inducement requires the existence of an enforceable contract, but not the breach of that contract. *See Bohnsack v. Varco, L.P.*, 668 F.3d

---

[70]     R. Doc. 266-36 at 67-68.

262, 277 (5th Cir. 2012) (listing the elements of a fraudulent inducement claim). And WWCS's tortious interference claim is based on false and misleading statements made by Oceaneering to potential clients.[71] Thus, Oceaneering is not entitled summary judgment on WWCS's fraudulent inducement and tortious interference claims.

## C. Attorney's Fees

Finally, Oceaneering and Mancini request summary judgment on their counterclaims for attorney's fees.[72] This request is moot in light of the Court's earlier dismissal of defendants' counterclaims.[73] Defendants may still move for attorney's fees under Federal Rule of Civil Procedure 54 within 14 days after entry of judgment. *See* Fed. R. Civ. P. 54(d)(2).

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motion for summary judgment.

New Orleans, Louisiana, this ___5th___ day of February, 2018.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[71] *See* R. Doc. 147 at 43.
[72] R. Doc. 266-36 at 57
[73] R. Doc. 318.