UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WRIGHT'S WELL CONTROL                                    CIVIL ACTION
SERVICES, LLC

VERSUS                                                          NO. 15-1720

OCEANEERING INTERNATIONAL,                           SECTION "R" (3)
INC.


**ORDER AND REASONS**

Defendant Oceaneering International, Inc. moves for summary judgment on plaintiff Wright's Well Control Services, LLC's breach of contract claim.[1] For the following reasons, defendant's motion is denied.


I.    **BACKGROUND**

Plaintiff Wright's Well Control Services, LLC (WWCS) and defendant Oceaneering International, Inc. (Oceaneering) both provide hydrate remediation services for the oil and gas industry. A hydrate is an ice-like solid that forms when water becomes mixed with oil and/or gas at high

---

[1]      R. Doc. 374.

pressure and low temperature.[2]  Hydrates can cause a pipeline to become blocked by "hydrate plugs," resulting in a loss of production.[3]

## A.    The Parties' Initial Hydrate Remediation Efforts

In 2008, ATP Oil and Gas Corporation contracted with Oceaneering to remove hydrates from a pipeline (Canyon Express project).[4]  At the time, Oceaneering had a hydrate remediation skid designed to clear hydrate plugs in smaller tubing; Oceaneering had not yet used it on a pipeline.[5]  This hydrate remediation skid featured a low-volume pump, and was fitted onto and powered by a remotely operated vehicle (ROV).[6]  Oceaneering successfully cleared some, but not all, of the hydrate plugs from ATP's pipeline in early 2009.[7]  Oceaneering's hydrate remediation skid also suffered various problems because of the presence of gas in the system, such as reduction in pumping capability and formation of hydrates in tubing connected to the skid.[8]  Oceaneering employees began discussing potential improvements to the hydrate remediation skid as early as February 2009.[9]

---

[2]    R. Doc. 147 at 3 ¶ 12.
[3]    *Id.* at 3-4 ¶¶ 12-13.
[4]    *Id.* at 7 ¶¶ 22-23.
[5]    *See* R. Doc. 300-10 at 13-14; R. Doc. 300-46 at 4.
[6]    R. Doc. 300-10 at 13-14; R. Doc. 300-15 at 4.
[7]    R. Doc. 300-12 at 11.
[8]    R. Doc. 300-10 at 3; R. Doc. 300-12 at 16; R. Doc. 300-15 at 4; R. Doc. 300-84.
[9]    R. Doc. 266-37 at 2.

ATP then contracted with WWCS to conduct further hydrate remediation in ATP's pipeline (Kings Peak project), even though WWCS did not yet have a complete hydrate remediation system.[10] WWCS developed its hydrate remediation system specifically for high-volume, deepwater applications, like ATP's pipeline.[11] WWCS's system, later patented, used a pump with a much higher displacement rate than the pump used in Oceaneering's skid.[12] This pump included a drill motor powered by pressurized seawater. *See generally* U.S. Patent No. 9,435,185 ('185 Patent). WWCS also designed a separator to remove gas from the system and discharge it to the surface.[13]

### B. The Nondisclosure Agreement

On December 11, 2009, WWCS and Oceaneering allegedly executed a Reciprocal Nondisclosure of Confidential and Proprietary Information Agreement (NDA).

The NDA's introductory section states: "It is the intention of the parties to this Agreement to exchange proprietary information. The disclosure and use of any proprietary data shall be governed in accordance with the

---

[10]  R. Doc. 300-12 at 6-15.
[11]  *See id.* at 7-8; R. Doc. 300-13 at 3.
[12]  *See* R. Doc. 300-15 at 5 (comparing Oceaneering's skid and WWCS's system).
[13]  *See* R. Doc. 300-13 at 4; R. Doc. 300-15 at 5.

following . . . ."[14]   Section One defines the scope of information covered by

the NDA:

> For the purpose of this Agreement, confidential and proprietary
> information "Information" shall be defined as but not limited to,
> performance, sales, financial, contractual, and special marketing
> information, ideas, technical data, all intellectual property
> including inventions, patents, pending patents and all other
> business, technical and financial information that the Disclosing
> Party develops, learns or obtains during the period over which it
> is (or is supposed to be) providing services as contracted for
> between the parties that relate to Recipient Party or the business
> or demonstrably anticipated business of the Recipient Party, or
> that are received by or for Recipient Party in confidence and
> concepts originated by the Disclosing Party. Proprietary
> information is further defined as data not previously available to
> the Receiving Party or others without restriction, nor normally
> furnished to others without compensation, and which the
> Disclosing Party desires to protect against unrestricted
> disclosure or competitive use, and which is furnished pursuant
> to this Agreement and appropriately identified as being
> proprietary when furnished.[15]

Two provisions restrict a recipient's use of information.  Section Two

states: "With respect to all proprietary information disclosed hereunder, the

Recipient Party agrees that for a period of three (3) years following the date

of this Agreement, unless terminated sooner by either party, such party shall

not . . . [u]se such information except for purposes of its business relationship

with the Disclosing party."[16]   Section Four provides: "Neither party shall

---

[14]   R. Doc. 404-2 at 2.
[15]   *Id.*
[16]   *Id.*

4

divulge or use any proprietary information disclosed to it hereunder by the other party for any purpose not connected with the effort contemplated by the Agreement."[17]

Section Six creates exceptions to a recipient's duty to protect and handle information. It provides, in relevant part:

> The obligation with respect to the protection and handling of proprietary information, as set forth in this Agreement, is not applicable to the following:
>
> > a) Information which is or becomes lawfully known or available to the receiving party without restriction from a source other than the Disclosing Party.
> >
> > b) Information which is or later falls within, the public domain without breach of this Agreement by the recipient.
> >
> > c) Information disclosed by the Disclosing Party to others on a nonrestrictive basis.[18]

## C.    WWCS's Patents

David Wright, who founded WWCS, and Jeffrey Dufrene filed Provisional Application No. 61/290,168 for their hydrate remediation system in December 2009, shortly after signing the NDA with Oceaneering.[19] This application specifically included the subsea separator.[20]   Wright and

---

[17]    *Id.* at 3.
[18]    *Id.*
[19]    R. Doc. 147 at 13 ¶ 43.
[20]    *Id.*

Dufrene filed non-provisional Patent Application No. 12/978,486 for the separator on December 24, 2010.[21]   These patent applications were published on June 30, 2011.   Wright and Dufrene later assigned their interests in the patents to WWCS.[22]  U.S. Patent No. 8,413,725 ('725 Patent) for the separator issued on April 9, 2013, and the '185 Patent for the hydrate remediation system issued on September 6, 2016.

The principal independent claim of the '185 Patent is a method of recovering a pipeline fluid from a source located in a subsea environment by connecting a fluid-powered motor, a pump, and a separator to the source of the fluid. '185 Patent at 19:58-20:18.  A drawing of a simplified embodiment of the system **10** is reproduced below.  *See id.* fig. 9.  Figure 1 labels the fluid source (a subsea pipeline) as **12**; the separator as **20**; the pump as **18**; the drill motor as **16**; and the emergency quick disconnects as **80**.  Lines **21A** and **21B** convey pressurized seawater from the vessel to the motor; gas from the separator rises to the surface through line **23**, while liquid from the separator is directed to the vessel through line **22**; and methane may be introduced into the system through line **92**.

---

[21]      *Id.* ¶ 44.
[22]      *Id.* ¶ 45.



*Figure 1*

A simplified embodiment of the separator is reproduced below. *See* '725 Patent fig. 1. Figure 2 labels the housing as **10**; the outer wall of the housing as **22** and the inner wall as **24**; the inlet as **14**; the non-gaseous outlet as **20**; the gas outlet as **18**; the baffle type members as **16**; and a perforated tube (part of a ball valve assembly) as **30**.



*Figure 2*

**D.    The Parties' Working Relationship and Oceaneering's Alleged Misuse of WWCS's Confidential Information**

The parties worked together on the Kings Peak project for ATP in late 2009 and early 2010.    While WWCS designed the hydrate remediation system itself and provided most of its components, Oceaneering provided

support and project management.[23]  WWCS's system successfully cleared the remaining hydrates in ATP's pipeline by March 2010.[24]

The parties worked together on several additional jobs using WWCS's system.  Shortly after completing the Kings Peak project, WWCS and Oceaneering performed hydrate remediation for Williams Field Services Gulf Coast Company, L.P. (Williams job).[25]  The parties used Oceaneering's preexisting ROV-powered pump in connection with WWCS's system on the Williams job.[26]  The parties later performed hydrate remediation for Marubeni Oil & Gas (Marubeni job)[27] and worked on another project for ATP.[28]  Because of Oceaneering's working relationship with WWCS, Oceaneering had access to designs of WWCS's system and numerous operational details.[29]

While the parties were working together on these jobs using WWCS's hydrate remediation system, Oceaneering was developing its own Flowline Remediation System (FRS).  There was some overlap between the FRS

---

[23]     R. Doc. 300-10 at 4.
[24]     R. Doc. 300-15 at 5.
[25]     *See* R. Doc. 128, 134.
[26]     *See, e.g.*, R. Doc. 300-128 at 4.
[27]     *See* R. Doc. 300-74.
[28]     *See* R. Doc. 300-13 at 34; R. Doc. 300-51.
[29]     *See generally* R. Doc. 300-39 at 59-77; R. Doc. 300-43 at 196-201; R. Doc. 300-66 at 4-12.

development team and the teams working on jobs with WWCS.[30] Oceaneering completed a draft functional specification of the FRS in January 2010.[31] Like WWCS's hydrate remediation system, Oceaneering's FRS was designed to pump high volumes of fluid through a separator.[32] Although Oceaneering developed a new, variable frequency drive (VFD) pump for the FRS, it chose to use its preexisting ROV-powered pump instead.[33] Oceaneering has performed hydrate remediation using the FRS on multiple jobs since 2012.[34] WWCS asserts that Oceaneering developed the FRS using confidential information disclosed under the NDA.[35]

### E.     Procedural History

On May 21, 2015, WWCS filed its initial complaint against Oceaneering, pleading patent infringement as well as various claims under Texas and Louisiana state law.[36] On November 16, 2015, the Court dismissed WWCS's breach of contract claim with prejudice to the extent that it rested on information in WWCS's patent applications or on conduct that occurred

---

[30]     *Compare* R. Doc. 300-42, *with* R. Doc. 300-39 at 23, R. Doc. 404-27 at 4, *and* R. Doc. 404-26 at 2.
[31]     R. Doc. 300-43 at 11.
[32]     *See id.* at 81.
[33]     R. Doc. 404-19.
[34]     *See* R. Doc. 300 at 26.
[35]     R. Doc. 147 at 12 ¶ 39.
[36]     R. Doc. 1.

after December 11, 2012, and dismissed plaintiff's statutory trade secret misappropriation claim under the Texas Uniform Trade Secrets Act.[37] After plaintiff filed a second and third amended complaint, Oceaneering moved to dismiss plaintiff's patent infringement claims. On February 13, 2017, the Court dismissed WWCS's patent claims, but without prejudice and with leave to amend.[38]

On February 27, 2017, WWCS filed its fourth amended complaint, which is the operative complaint.[39] The complaint asserted patent infringement claims, as well as claims for Texas common law misappropriation, Texas common law misappropriation of trade secrets, Louisiana statutory misappropriation of trade secrets under the Louisiana Uniform Trade Secrets Act (LUTSA), and Texas common law breach of contract, breach of confidential relationship, tortious interference with prospective business relations, fraudulent inducement, business disparagement, and unfair competition.[40] On August 23, 2017, the Court dismissed WWCS's LUTSA claim and its claims for Texas common law misappropriation, Texas common law misappropriation of trade secrets,

---

[37] R. Doc. 56 at 42.
[38] R. Doc. 141 at 21.
[39] R. Doc. 147.
[40] *Id.* at 36-46 ¶¶ 89-139.

breach of confidential relationship, and business disparagement as untimely.[41] The Court also dismissed WWCS's claim for unfair competition to the extent the claim is based on misappropriation.[42] Additionally, on August 28, 2017, the Court dismissed WWCS's claim for infringement of the '185 Patent because Oceaneering had not used the FRS since the '185 Patent issued.[43]

After the parties briefed the disputed claim language of the '725 Patent, the Court held a claim construction hearing on October 12, 2017. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The Court issued its claim construction order on November 6, 2017.[44] On January 22, 2018, the Court dismissed WWCS's claim for infringement of the '725 Patent.[45]

Oceaneering filed its first motion for summary judgment on plaintiff's state law claims on September 28, 2017.[46] The Court denied the motion on February 5, 2018.[47] In the order, the Court held that the NDA does not cover

---

[41]    R. Doc. 258.

[42]    *Id.*; *see also* R. Doc. 340 (clarifying the Court's order dated August 23, 2017).

[43]    R. Doc. 260.

[44]    R. Doc. 299.

[45]    R. Doc. 343.

[46]    R. Doc. 266.

[47]    R. Doc. 350.

information in the public domain, and that misuse of such information does not violate the NDA.[48]  The Court further held that information contained in WWCS's patents, a white paper by WWCS employee Fernando Hernandez, two presentations, and three magazine articles is in the public domain, and therefore not protected by the NDA.[49]  Oceaneering again moves for summary judgment on WWCS's breach of contract claim.[50]  Additionally, WWCS moves to exclude an expert report and affidavit by Norm McMullen which Oceaneering cites as evidence in support of summary judgment.[51]

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta &*

---

[48]    R. Doc. 350 at 18.
[49]    *Id.* at 19-20.
[50]    R. Doc. 374.
[51]    R. Doc. 400.

*Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).   All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991).  The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by

merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

WWCS's breach of contract claim is based on Oceaneering's alleged misuse of information protected by the December 2009 NDA.[52] Oceaneering moves for summary judgment on the ground that WWCS fails to put forth sufficient evidence in support of its claim.

The parties largely argue past each other. Much as it did in its first summary judgment motion, Oceaneering focuses on the allegedly misused

---

[52]     R. Doc. 147 at 41-42 ¶¶ 113-16.

pieces of proprietary information listed in WWCS's response to an interrogatory.  These informational items are:

1) The need to separate gas from liquid prior to the gaseous and non-gaseous fluid being conveyed toward the surface;

2) Use of a subsea separator for hydrate remediation;

3) Engineering on the design of a subsea separator;

4) Use of baffles in subsea separator;

5) Test results on the necessary components of the system and the stresses incurred on the subsea separator while operating at depth to determine optimum design;

6) Location of the fluid inlet, fluid outlets, and gas outlet on the subsea separator;

7) Use of a valve system on the gas outlet of the subsea separator;

8) Use of a filter at the fluid inlet of the subsea separator;

9) Incorporation of ports on the subsea separator to inject chemicals into the separator;

10) The need to inject chemicals into the subsea separator to prevent hydrates in the remediation system;

11) Need for a subsea pump that is capable of pumping a certain concentration of gas and sand;

12) The need for larger coiled tubing to prevent hydrates within the coiled tubing itself;

13) The need for larger coil tubing for larger flow volume;

14) Knowledge of how to connect the subsea pump, subsea motor, and subsea separator in order to draw down the pressure in the pipeline sufficient to create a vacuum;

15) All necessary drawings to show how the system connects to the wellhead or pipeline, as well as how each component must be

16

deployed, connected and arranged, including schematics identifying dimensions of all components, and connection points for all coiled tubing and jumpers;

16) Modified schematics showing how WWCS' subsea separator could connect to Oceaneering's pump system;

17) Structural modification to WWCS' subsea separator to connect to Oceaneering's pump system; and

18) Engineering on the seal joints required between the pump and motor.[53]

Oceaneering argues that each of these pieces of information is either in the public domain—and thus not protected by the NDA—or not used by Oceaneering in the FRS.[54]

In response, WWCS argues that Oceaneering violated the NDA by (1) relying on WWCS's confidential information in developing and marketing the FRS, (2) disclosing WWCS's confidential information to a third party, and (3) failing to adequately protect WWCS's confidential information. WWCS focuses on a different list of eighteen pieces of information allegedly misused by Oceaneering:

a) Information on the flow and pressure, size and weight, and other constraints of WWCS's system needed to interface Oceaneering's manifold design to integrate the manifold with WWCS's system;

---

[53]    *See* R. Doc. 374-4 at 8-9.
[54]    R. Doc. 374-1 at

b) WWCS system integration tests procedures and results before the initial deployment obtained through on site, in person, participation;

c) "Reports from the field on Wright's separator operations" during WWCS's work on ATP during January 2010;

d) WWCS's specific Operating procedures from its January 2010 work for ATP, which Oceaneering also worked on;

e) Issues arising from WWCS's pump operations and possible solutions learned from actual on the job performance; 18

f) WWCS's separator preliminary drawings, and pump and separator specifications and details;

g) Details of how to integrate Oceaneering's chemical injection, [emergency disconnect system] and coil tubing into WWCS's system as well as integration points for the equipment;

h) Schematics of the entire integrated layout of WWCS's system as an entire package with details on connection points, coil tubing sizes, and types of chemicals being injected through the chemical panel;

i) Everything Jim McAllister learned on the January-February 2010 ATP job performed by WWCS;

j) WWCS's motor/pump coupling details and issues with interfaces;

k) Improvements, lessons learned and fabrication issues on WWCS's ATP Equipment;

l) WWCS's daily activities and operations on the project for ATP which was performed in the January-February 2010 timeframe;

m) The operational need to purge the gas discharge line and knowledge of WWCS's other operating parameters;

n) Knowledge of specific operational issues, their causes, and how to react/respond to them;

o) Firsthand knowledge of WWCS's daily and even hourly activities and operations on the 2010 Williams job, which included hooking up Oceaneering's [pump] to WWCS's separator and the specific performance details and procedures for using the [pump] with a separator to successfully clear a hydrate with a separator;

p) Specific details, including the scope of work and connection/setup sequencing, and specifications involved in the 2010 Marubeni project performed by WWCS;

q) Details of WWCS's daily operations and performance on the ATP project beginning in November 2010; and,

r) WWCS's day rate and expected utilization rate for its equipment.[55]

Additionally, WWCS puts forth a novel interpretation of Section 6(b) of the NDA, arguing that information in the "public domain" means information that has no legal protections or restrictions whatsoever.[56] WWCS argues that under this interpretation, information included in its patents remains covered by the NDA.[57]

In its reply brief, Oceaneering challenges the propriety of WWCS's new list of allegedly misused pieces of confidential information in light of WWCS's failure to disclose this list during discovery.[58] Oceaneering also challenges WWCS's interpretation of the NDA, and offers a narrow

---

[55] R. Doc. 404 at 6-9 (footnotes omitted).
[56] *Id.* at 14.
[57] *Id.*
[58] R. Doc. 397 at 3.

interpretation of the scope of information covered by Sections Two through Four.[59]

### A.    Compliance with Discovery Rules

The Court first addresses whether WWCS may base its breach of contract claim on the eighteen allegedly misused pieces of confidential information cited in its brief.

By way of background, WWCS originally identified eighteen informational items in response to Interrogatory No. 15.[60] This interrogatory reads: "Please identify, with specificity (by product, component, features, and specification, where appropriate) all of the alleged trade secrets and any confidential or proprietary information that WWCS alleges or contends Defendants misappropriated or misused, including but not limited to as alleged in Counts II-IV of the Complaint."[61]   Oceaneering framed its first motion for summary judgment on WWCS's breach of contract claim around these eighteen items.[62]  But WWCS relied on different evidence in its October 31, 2017 opposition to this first motion for summary judgment.  Specifically, WWCS argued that Oceaneering misused a number of "small operational

---

[59]     *Id.* at 7, 15.
[60]     *See* R. Doc. 397-3 at 3-4.
[61]     *Id.* at 3.
[62]     R. Doc. 266.

details" (broadly characterized as "know-how") that WWCS learned or developed "through trial and error" on jobs with Oceaneering.[63] In its February 5, 2018 order, the Court did not rule on whether this evidence was sufficient to survive summary judgment. Instead, the Court denied Oceaneering's motion and instructed that if the parties submitted further summary judgment briefing on plaintiff's breach of contract claim, they must: (1) specifically state what WWCS information is covered by the NDA; (2) propose constructions of what type of conduct is prohibited by the NDA; and (3) specifically state what conduct by Oceaneering violated the NDA.[64]

After the Court issued this order, Oceaneering requested WWCS to supplement its response to Interrogatory No. 15.[65] WWCS did so on February 16, identifying the same eighteen items that were disclosed in its original response.[66] WWCS also directed Oceaneering to WWCS's opposition to the first motion for summary judgment and attached exhibits.[67] Oceaneering then moved to compel WWCS to supplement its responses to interrogatories.[68] WWCS provided the requested supplement on March 13,

---

[63]    R. Doc. 300 at 32; *see also id.* at 15, 17-18, 21, 23-25, 32-33, 41-42.
[64]    R. Doc. 350 at 27.
[65]    *See* R. Doc. 397 at 3.
[66]    R. Doc. 397-2 at 6-7.
[67]    *Id.* at 7.
[68]    R. Doc. 363. The Magistrate Judge later denied this motion. R. Doc. 380.

the deadline for filing summary judgment motions. In this March 13 supplemental response, WWCS again listed the eighteen informational items that were disclosed in its original response.[69] WWCS also added a nineteenth item: "WWCS's confidential business information including the dayrate for the WWCS system and the estimated number of days WWCS expected to use its system."[70] Additionally, WWCS described the operational details that Oceaneering allegedly relied on in developing the FRS, and pointed to a number of documents in support of its claim.[71]

In the instant motion for summary judgment, Oceaneering again frames its argument around the original items listed in WWCS's response to Interrogatory No. 15. For the most part, WWCS does not defend these informational items, and instead relies on the eighteen pieces of information listed in its brief. There is little overlap between these two lists. Oceaneering argues that WWCS should be estopped from relying on the informational items cited in WWCS's brief because their untimely disclosure violated the Federal Rules of Civil Procedure.

The Federal Rules of Civil Procedure "are designed to narrow and clarify the issues and to give the parties mutual knowledge of all relevant

---

[69] R. Doc. 374-4 at 8-9.
[70] *Id.* at 9.
[71] *Id.* at 9-11.

facts." *Shelak v. White Motor Co.*, 581 F.2d 1155, 1159 (5th Cir. 1978). In so doing, the rules prevent "trial by ambush." *Id.* Here, the relevant rules are Rule 33, requiring a party to respond fully to an interrogatory, and Rule 26(e), imposing upon a party the continuing duty to supplement its interrogatory responses. *See* Fed. R. Civ. P. 33(b)(3) ("Each interrogatory must, to the extent it is not objected to, be answered separately and fully . . . ."); Fed. R. Civ. P. 26(e)(1) ("A party . . . who has responded to an interrogatory . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . .").

Although WWCS's most recent supplemental response to Interrogatory No. 15 adequately discloses the evidentiary basis of WWCS's breach of contract claim, this supplemental response was not timely. Under Rule 26(e), WWCS should have supplemented its response to Interrogatory No. 15 before March 13—which was fewer than two months before trial, and after the close of discovery. Only those informational items included in WWCS's earlier response to Interrogatory No. 15 were properly disclosed. Specifically, the drawings and schematics described in items (f) and (h) of

WWCS's list are covered by items (15) and (16) of Oceaneering's list. Likewise, the test results described in item (b) are covered by item (5). The remaining items in WWCS's list were not properly disclosed during discovery.

Ordinarily, the Court would foreclose WWCS from relying on undisclosed information at this point in the litigation. It is no answer that the documents cited by WWCS were produced in discovery because Interrogatory No. 15 goes to the *characterization* of those documents. Indeed, most of the documents were produced by Oceaneering itself, but that does not mean Oceaneering knew how WWCS would use those documents in support of its breach of contract claim.

But there is a countervailing consideration: WWCS "made known" the substance of its breach of contract contentions "during the discovery process or in writing." Fed. R. Civ. P. 26(e). As explained earlier, most of the documents upon which WWCS now relies were cited and discussed in its October 31, 2017 opposition to Oceaneering's first motion for summary judgment. This took place months before discovery closed. Because Oceaneering had an opportunity to conduct discovery on WWCS's contentions, it was not prejudiced by WWCS's failure to supplement its interrogatory response. *See Reed v. Iowa Marine & Repair Corp.*, 16 F.3d

82, 85 (5th Cir. 1994) (noting Rule 26(e)'s "basic purpose of preventing prejudice and surprise").   Thus, WWCS complied with Rule 26(e) with respect to any informational item that was identified in both WWCS's opposition to the first motion for summary judgment and WWCS's March 13 supplemental response to Interrogatory No. 15.

The Court finds that WWCS cited and discussed items (a), (b), (c), (d), (e), (g), (h), (j), (k), (l), (m), (n), (o), (p), and (q) in both its first opposition brief and the supplemental response.[72]   Additionally, item (f)—comprising schematics and drawings—is covered by WWCS's original interrogatory response.

Oceaneering has not received sufficient notice of informational items (i) and (r).   Item (i) covers "[e]verthing Jim McAllister learned on the January-February 2010 ATP job performed by WWCS."   In support of this item, WWCS cites an email from Oceaneering employee Clyde Hewlett in which Hewlett states: "Jim McAllister has also been on the OI 3 for most [of] ATP's program . . . .  I will have him download all he's learned on the ATP job to help guide OII's initiative."[73]   Although WWCS cited this evidence in its first opposition brief, WWCS failed to explain what *confidential* information

---

[72]     *Id.* at 12-26.
[73]     R. Doc. 300-98 at 2.

McAllister learned on the ATP Kings Peak job.[74]  WWCS again fails to do so in its present opposition brief.  Thus, WWCS failed to properly disclose item (i) as evidence of confidential WWCS information.  WWCS did adequately disclose this Hewlett email as evidence of *misuse*, however, by discussing the email in both the opposition to Oceaneering's first summary judgment motion and the supplemental response to Interrogatory No. 15.

Informational item (r) covers "WWCS's day rate and expected utilization rate for its equipment."  WWCS first disclosed this item in its March 13, 2018 supplemental response to Interrogatory No. 15.[75]  Thus, WWCS failed to properly disclose informational item (r).

If a party fails to provide supplemental information, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  In *Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir. 1990), the Fifth Circuit described four factors to determine whether "to exclude evidence that was not properly designated": (1) the explanation for the failure to adhere to the deadline; (2) the importance of the proposed modification of the scheduling order; (3) the potential

---

[74]     R. Doc. 300 at 17.
[75]     R. Doc. 374-4 at 9.

prejudice that could result from allowing the modification; and (4) the availability of a continuance to cure that prejudice. *Id.* at 791.

WWCS provides no explanation for its failure to adequately disclose items (i) and (r). Moreover, the importance of this information is minimal in light of the other evidence WWCS has in support of its claim. And Oceaneering would be prejudiced by its late disclosure because discovery has long since closed. Thus, the Court finds that WWCS's failure to comply with the discovery rules with respect to items (i) and (r) was neither harmless nor substantially justified. *See* Fed. R. Civ. P. 37(c)(1).

WWCS may not rely on informational items (i) and (r) at trial to show what confidential information is protected by the NDA. So long as WWCS can point to other evidence of confidential information obtained by McAllister on the ATP Kings Peak job that the Court has found properly identified, however, WWCS may use the Hewlett email as evidence of misuse.

## B.    Interpretation of the Contract

The Court next turns to the proper interpretation of the NDA. The parties dispute two terms: (1) the meaning of "proprietary information" as used in Sections Two through Four; and (2) the scope of the "public domain" exception in Section 6(b).

The NDA is governed by Texas law. When interpreting a written contract under Texas law, "a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017) (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008)). "A contract is unambiguous if it can be given a definite or certain legal meaning," but is ambiguous if it "is subject to two or more reasonable interpretations." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).

Words in a contract must be given "their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)). The Court must also "examine the entire agreement and give effect to each provision so that none is rendered meaningless." *Id.* (quoting

*Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)).  Moreover, the Texas Supreme Court has instructed "that a court should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served." *Id.* (quoting *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996)).

### 1.  *Proprietary Information*

Oceaneering distinguishes three categories of information covered by the NDA: "proprietary information," "confidential information," and (capitalized) "Information."  Oceaneering argues that "proprietary information" incorporates the identification requirement in the second sentence of Section One.

The first sentence of Section One provides a broad definition of "Information":

> For the purpose of this Agreement, confidential and proprietary information "Information" shall be defined as but not limited to, performance, sales, financial, contractual, and special marketing information, ideas, technical data, all intellectual property including inventions, patents, pending patents and all other business, technical and financial information that the Disclosing Party develops, learns or obtains during the period over which it is (or is supposed to be) providing services as contracted for between the parties that relate to Recipient Party or the business or demonstrably anticipated business of the Recipient Party, or

that are received by or for Recipient Party in confidence and concepts originated by the Disclosing Party.[76]

The second sentence reads:

Proprietary information is further defined as data not previously available to the Receiving Party or others without restriction, nor normally furnished to others without compensation, and which the Disclosing Party desires to protect against unrestricted disclosure or competitive use, and which is furnished pursuant to this Agreement *and appropriately identified as being proprietary when furnished*.[77]

The NDA provides no separate definition of "confidential information." According to Oceaneering, the NDA deliberately refers to "proprietary information" in some sections—specifically, Sections Two, Three, Four, and Six—and "confidential information" in others. Oceaneering argues that because Sections Two through Four refer only to "proprietary information," the NDA's restrictions on use and disclosure apply only to information identified as proprietary when furnished. It appears to be undisputed that WWCS did not identify any relevant information as proprietary when furnished to Oceaneering.

Oceaneering offered a similar interpretation of "proprietary information" in its first motion to dismiss.[78] At the time, the Court held that

---

[76] R. Doc. 404-2 at 2
[77] *Id.* (emphasis added).
[78] R. Doc. 32-1 at 21-23.

Section One is ambiguous because of the word "further."[79]   The Court reasoned that the second sentence of Section One could "further" define "proprietary information" by either narrowing the definition provided in the first sentence, or providing an independent definition.  But Oceaneering did not distinguish between "proprietary information" and "confidential information" as it does now, and the Court did not address this distinction.

Oceaneering's present argument does not hold water.  While it is unclear why some sections of the NDA refer to "proprietary information" and others refer to "confidential information," there is no reasoned basis to distinguish between the two.  Indeed, Oceaneering's interpretation creates several inconsistencies.  For example, why would Sections Two and Four limit the disclosure only of proprietary information, while Section Nine permits the disclosing party to demand the return or destruction only of confidential information?  Why would Section One impose upon the disclosing party a marking requirement on proprietary information, while Section Five imposes upon the receiving party a marking requirement on certain confidential information?  And why would the restriction on use apply only to proprietary information, while the "as is" warranty under Section Eight applies only to confidential information?   Moreover,

---

[79]      R. Doc. 56 at 16-18.

Oceaneering's interpretation of "proprietary information" renders the first sentence of Section One meaningless because no other section refers to "Information" as defined in that sentence. In "examin[ing] the entire agreement and giv[ing] effect to each provision so that none is rendered meaningless," *Kachina Pipeline*, 471 S.W.3d at 450, the Court finds that the NDA uses the terms "proprietary information" and "confidential information" interchangeably. As the Court previously held, however, the NDA is ambiguous as to whether the second sentence of Section One limits or expands the scope of information covered by the NDA.

### 2. Public Domain Exception

The Court has held that the NDA does not protect any information in the public domain.[80] The Court has further held that this public domain exception includes information contained within WWCS's patents.[81] WWCS now challenges this interpretation, and thus seeks reconsideration of the Court's earlier rulings.

Federal Rule of Civil Procedure 54(b) governs reconsideration of non-final court orders. "Under Rule 54(b), 'the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the

---

[80]     R. Doc. 56 at 20; R. Doc. 350 at 18.
[81]     R. Doc. 56 at 20; R. Doc. 350 at 19.

absence of new evidence or an intervening change in or clarification of the substantive law.'" *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (per curiam) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990)). A district court's discretion to reconsider its interlocutory rulings "is not cabined by the heightened standards for reconsideration governing final orders." *Id.* (quoting *Saint Annes Dev. Co. v. Trabich*, 443 F. App'x 829, 832 (4th Cir. 2011)).

WWCS first makes a plain meaning argument. As WWCS notes, one dictionary defines "public domain" as "the realm embracing property rights that belong to the community at large, are unprotected by copyright or patent, and are subject to appropriation by anyone." *Public Domain*, *Merriam-Webster Dictionary* Online, www.merriam-webster.com. Similarly, Black's Law Dictionary defines "public domain" as "[t]he universe of inventions and creative works that are not protected by intellectual-property rights and are therefore available for anyone to use without charge." *Public Domain*, *Black's Law Dictionary* (10th ed. 2014). The dictionary further explains that "[w]hen copyright, trademark, patent, or trade-secret rights are lost or expire, the intellectual property they had protected becomes part of the public domain and can be appropriated by anyone without liability for infringement." *Id.*

Notwithstanding these dictionary definitions of "public domain," in the trade secrets context, courts often use the term to describe the universe of information that is publicly available—including information contained in patents. For example, the Federal Circuit has deemed it "well established that disclosure of a trade secret in a patent places the information comprising the secret into the *public domain*." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (emphasis added) (quoting *Stutz Motor Car of Am. v. Reebok Int'l*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995)); *see also Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1295-96 (11th Cir. 2003) (noting that information contained in patent applications are in the public domain); *Raytheon Co. v. Indigo Sys. Corp.*, 598 F. Supp. 2d 817, 822 n.1 (E.D. Tex. 2009) (noting that information is "in the public domain," and thus not a trade secret, if it is "publicly available at the time of the alleged misappropriation"). But other courts, especially in older cases, have used "public domain" according to its dictionary meaning. *See, e.g.*, *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 652 (5th Cir. 1997) ("Matter is in the public domain only if no intellectual property law, such as patent, copyright, or trade secrets, protects it."); *Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1314 (5th Cir. 1971)

(distinguishing "a patent protected art" from "principles which are in the public domain").

WWCS also argues that patents are explicitly included in Section One's definition of information covered by the NDA.  Thus, it argues, interpreting patents as within Section Six's public domain exception essentially reads out "patents" in Section One.  *See Kachina Pipeline*, 471 S.W.3d at 450.

WWCS's argument misses a critical distinction: the information contained in a patent is not the same as the invention protected by the patent.  While the invention itself does not pass into the public domain until the patent expires, the information contained in the patent—and the patent application—is "revealed . . . to the inventor community so that other inventors can build upon it."  *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 611 (5th Cir. 2011) (quoting *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 707 (7th Cir. 2006)).  Thus, a product that contains some, but not all, of the elements disclosed in a patent does not infringe on the patented device.  *See Aquatex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1382 (Fed. Cir. 2005); *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004).  And a process that incorporates some, but not all, of the steps described in a method patent does not infringe on the claimed method.

*See Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1366 (Fed Cir. 2012).

The Court therefore finds that the "public domain" exception in Section Six of the NDA is unambiguous: it means that information contained in patents and patent applications is not protected by the NDA, although the patented inventions themselves remain protected. In other words, the NDA preserves WWCS's right to sue for patent infringement, but does not otherwise protect information contained in WWCS's patents.

## C. Breach of Contract

The Court next addresses whether WWCS has put forth enough evidence to support a breach of contract claim. Under Texas law, "[t]he elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 579 (5th Cir. 2015) (quoting *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. App. 2009)). Oceaneering seeks summary judgment only as to breach, arguing that it did not use information protected by the NDA in creating its FRS.[82]

---

[82] R. Doc. 374-1 at 6.

## 1. Information Covered by the NDA

To show breach, WWCS must first point to information that is covered by the NDA.  In terms of subject matter, such information includes "performance, sales, financial, contractual, and special marketing information, ideas, technical data, all intellectual property including inventions, patents, pending patents and all other business, technical and financial information."  Furthermore, such information must either be (1) received by Oceaneering in confidence, or (2) developed, learned, or obtained by WWCS during the period over which it was, or was supposed to be, providing services as contracted for between the parties, so long as the information is related to Oceaneering, its business, or its demonstrably anticipated business.  But the NDA does not cover any information that is within, or later falls within, the public domain, or is disclosed to other parties on a nonrestrictive basis.  The Court further notes that it previously found the NDA ambiguous as to whether confidential or proprietary information must be identified as such when furnished.  It appears undisputed that no WWCS information was identified as confidential when it was provided to Oceaneering.  Thus, if the jury finds that the NDA protects only information identified as confidential, then WWCS will be unable to show that any relevant information was misused by Oceaneering.

As explained earlier, the NDA does not cover information in WWCS's patents,[83] a white paper by WWCS employee Fernando Hernandez,[84] two presentations,[85] and three magazine articles,[86] all of which are now in the public domain. This unprotected information describes the structure, design, and general functions of the system. The following informational items in WWCS's original response to Interrogatory No. 15, listed in Part III.A., have generally fallen into the public domain:

- Item (1): the need to separate gas from liquid before they are conveyed to the surface;[87]

- Item (2): use of a subsea separator for hydrate remediation;[88]

- Item (3): engineering on the design of the separator;[89]

- Item (4): use of baffles in the separator;[90]

- Item (6): locations of the inlets and outlets on the separator;[91]

- Item (7): use of a valve on the gas outlet of the separator;[92]

- Item (8): use of a filter at the fluid inlet of the separator;[93]

---

[83] *See* '725 Patent; '185 Patent.
[84] R. Doc. 266-14 at 14-24.
[85] R. Doc. 266-12 at 4-33; R. Doc. 266-13.
[86] R. Doc. 266-15 at 2-4; R. Doc. 266-16; R. Doc. 266-17.
[87] '725 Patent at 1:22-28.
[88] *See generally* '725 Patent.
[89] *See generally id.*
[90] *Id.* at 9:15-16.
[91] *Id.* fig. 6, tbl. 1.
[92] *Id.* at 5:31-6:41.
[93] *Id.* fig. 11.

- Item (10): the need to inject chemicals into the separator to prevent hydrate formation;[94]

- Items (12) and (13): the size of coiled tubing;[95]

- Item (15): certain drawings and schematics.[96]

WWCS bases its breach of contract claim on eighteen pieces of information (listed in Part III.A) that are generally distinct from the informational items in WWCS's original response to Interrogatory No. 15. Apart from items (i) and (r), these pieces of information fall under the general rubric of operational details—instructions on how to operate WWCS's system and observations about how it operates in practice. For example, WWCS points to notes made by Oceaneering employee Jim McAllister describing the WWCS system's performance on the ATP Kings Peak project, listing ten steps for operating the system, and revealing when to inject methanol and how much to inject.[97] WWCS also points to WWCS service orders on the Williams job from May 2010, describing the daily operations of the WWCS system and detailing when and how to purge the coiled tubing.[98] Other pieces of information include daily reports by then-Oceaneering employee Fernando Hernandez about the WWCS system's

---

[94] '185 Patent at 15:58-67.
[95] *Id.* at 13:47-58.
[96] *Id.* figs 1-12; '725 Patent figs. 1-12; R. Doc. 266-13 at 13.
[97] R. Doc. 404-12.
[98] R. Doc. 300-43 at 196-97, 199.

progress on the Williams job;[99] detailed instructions for operating the WWCS system and Oceaneering's pump on the Marubeni job;[100] preliminary drawings and schematics of the WWCS system, with handwritten notes about pump rates;[101] test procedures for WWCS's pump;[102] and knowledge of how to modify Oceaneering's emergency quick disconnects so that they would work when used with WWCS's system.[103]

These operational details constitute either performance or technical information within the meaning of Section One of the NDA. This information was developed, learned, or obtained by WWCS on jobs with Oceaneering, and is related to those jobs. Oceaneering has not asserted that any of the operational details are in the public domain. Thus, WWCS has raised a genuine dispute as to whether the NDA protects this information.

## 2. *Misuse of Covered Information*

WWCS must next show that Oceaneering failed to perform one of its obligations with respect to information covered by the NDA. WWCS principally argues that Oceaneering violated the NDA by misusing

---

[99]     R. Doc. 300-39 at 59-77.
[100]    R. Doc. 300-66.
[101]    R. Doc. 404-5 at 97-98.
[102]    R. Doc. 300-39 at 6-8.
[103]    *See* R. Doc. 300-112 at 2.

confidential and proprietary information.[104]  The NDA forbids the receiving

party from using confidential information "except for purposes of its

business relationship with the Disclosing Party."[105]  To interpret the meaning

of "use," the Court turns to Texas trade secrets law, which broadly defines

improper use as "any exploitation of the trade secret that is likely to result in

injury to the trade secret owner or enrichment to the defendant."  *Gen.*

*Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 451 (5th Cir. 2007) (quoting

Restatement (Third) of Unfair Competition § 40 cmt. c (1995)).  Improper

use of a trade secret includes "relying on the trade secret to assist or

accelerate research or development" and "soliciting customers through the

use of information that is a trade secret."  *Id.*

The Fifth Circuit applied this definition of "use" in *Wellogix, Inc. v.*

*Accenture, L.L.P.*, 716 F.3d 867 (5th Cir. 2013).  Wellogix presented evidence

showing

> that Accenture joined with SAP to develop a complex services
> component for BP's P2P pilot; that, around the time that
> Accenture and SAP partnered, they were able to access Wellogix's
> dynamic templates source code that had been uploaded to the
> confidential eTrans portal; that an Accenture document
> referenced the "creation of . . . complex service templates," and
> then "right below" stated: "Use Wellogix content"; that the same

---

[104]     R. Doc. 404 at 16.

[105]     R. Doc. 404-2 at 2; *see also id.* at 3 ("Proprietary information which is
exchanged, may be used only by the Receiving Party in connection with
Disclosing Party's services and projects . . . .").

document provided that the templates "better deliver similar or better functionality than Wellogix or we may have a problem"; that other Accenture documents referenced Wellogix's templates, and that, as the pilot progressed, a BP employee told Wellogix that the company should: "sue Accenture . . . [b]ecause Accenture was utilizing [Wellogix's] confidential information and building out [its] functionality."

*Id.* at 877. The court held that this evidence sufficed to support the jury's finding of misuse of Wellogix's trade secrets. *Id.* Accenture argued that "its templates lacked dynamic features, and therefore were nothing like Wellogix's." *Id.* (internal quotation marks omitted). But the court rejected this argument, noting that "the standard for finding use is not whether Accenture's templates contained Wellogix trade secrets, but whether Accenture relied on the trade secrets to assist or accelerate research or development of its templates." *Id.* (internal quotation marks omitted).

Here, a reasonable juror could infer that Oceaneering relied on operational details about the WWCS system to assist or accelerate the development of the FRS. For example, the FRS development file purportedly includes WWCS service orders made during the Williams job that contain information about purging coiled tubes and injecting methanol.[106] The development file also includes McAllister's handwritten notes describing the WWCS system's performance on the ATP Kings Peak project, listing ten steps

---

[106]    R. Doc. 300-43 at 196-201.

for operating the system, and revealing when to inject methanol and how much to inject.[107]  One of Oceaneering's corporate deponents admitted that documents in the FRS development file were "used to aid and assist in the development of [the FRS]."[108]

Additional circumstantial evidence supports the inference that confidential information about WWCS's hydrate remediation system aided Oceaneering in the development of the FRS.  For example, in an email dated February 16, 2010, Oceaneering employee Clyde Hewlett indicated that he would ask fellow employee Jim McAllister to "download all he's learned on the ATP job to help guide [Oceaneering's] initiative."[109]  *Cf. Wellogix*, 716 F.3d at 877-78 ("A jury could legitimately infer on the basis of, for example, the Accenture email suggesting that the company should use Wellogix for content, that Accenture relied on Wellogix's templates to develop its own." (internal citations and quotation marks omitted)).  Oceaneering's FRS development team also scheduled meetings to discuss "lessons learned/design review for Wright's Well [emergency quick disconnect]

---

[107]  R. Doc. 404-12.
[108]  R. Doc. 404-10 at 4.
[109]  R. Doc. 300-98 at 2.

system and [methane] injection system," and "lessons learned" from the ATP Kings Peak job.[110]

More generally, several Oceaneering employees worked both on jobs with WWCS and on the FRS development team.[111] Chris Mancini and Ryan Custer, for example, both participated in the development of the FRS and monitored WWCS's progress on the Williams job. Their daily reports from the Williams job indicate that they learned how to successfully operate Oceaneering's pump in conjunction with WWCS's system.[112] Then-Oceaneering employee Fernando Hernandez also wrote daily reports about the WWCS system's progress on the Williams jobs, including the pressures recorded in the system, and sent the reports to Lee Willmore, Richard Thompson, Custer, and Mancini—all of whom were on the FRS development team.[113] Furthermore, some employees—including McAllister and Custer— stated in depositions that they were not aware of the NDA between

---

[110]    R. Doc. 300-42 at 14, 27.

[111]    *Compare* R. Doc. 300-42 (development team includes Mitch Holloway, Lee Willmore, Chris Mancini, Richard Thompson, and Ryan Custer), *with* R. Doc. 300-39 at 23 (team working on Williams project includes Chris Mancini), R. Doc. 404-27 at 4 (Hernandez email about Williams project sent to Lee Willmore, Richard Thompson, Ryan Custer, and Chris Mancini), *and* R. Doc. 404-26 at 2 (team working on ATP Kings Peak project includes Mitch Holloway and Lee Willmore).

[112]    R. Doc. 300-128.

[113]    R. Doc. 300-39 at 59-77.

Oceaneering and WWCS.[114]  Indeed, at that time, Oceaneering had no policy or standard practice of communicating NDAs to Oceaneering employees.[115]

Although Oceaneering's FRS does not incorporate every element of WWCS's system,[116] this alone does not disprove misuse under the NDA.  As the Fifth Circuit held in *Wellogix*, the standard for finding use is whether the defendant relied on protected information to assist or accelerate development—not whether the defendant actually incorporated the protected information.  716 F.3d at 877.  WWCS points to a number of reasonable inferences of such reliance.  First, as noted earlier, the FRS development file contained several pieces of confidential WWCS information, including McAllister's handwritten notes.  One of Oceaneering's corporate deponents conceded that "[t]here are similarities" between WWCS's operating procedure (as recorded in McAllister's notes) and Oceaneering's operating procedure for the FRS.[117]  Second, Oceaneering had performance data on how its pump operated in conjunction with WWCS's system.  When Oceaneering developed the FRS, which is generally similar to WWCS's system, performance data on its pump would have been

---

114    R. Doc. 404-20 at 5; R. Doc. 404-28 at 10.
115    R. Doc. 404-3 at 3.
116    Most notably, the FRS features an ROV-powered motor and pump instead of WWCS's fluid-powered drill motor and pump.
117    R. Doc. 404-10 at 6.

useful.  Indeed, Oceaneering decided to use that same Oceaneering pump—instead of the newly developed VFD pump—in the FRS.[118]  Third, Oceaneering adopted the modifications to its emergency quick disconnects that WWCS required for its hydrate remediation system.[119]  Based on this evidence, a reasonable juror could infer that confidential information about the WWCS system assisted Oceaneering in designing its FRS.  *See Wellogix*, 716 F.3d at 877.  Thus, WWCS has raised a genuine dispute as to whether Oceaneering breached the NDA by misusing operational details about WWCS's system.

WWCS also contends that Oceaneering used information covered by the NDA to solicit customers.[120]  WWCS cites an internal BP email suggesting that Oceaneering had taken credit for the success of the ATP and Marubeni jobs.[121]  Without more, this evidence does not raise a genuine dispute as to misuse of confidential information.  Oceaneering was involved in those projects, and nothing in the NDA prevents Oceaneering from disclosing that involvement to third parties.  Even if Oceaneering exaggerated its involvement by stating that the FRS, rather than the WWCS system,

---

[118]   R. Doc. 404-19.
[119]   R. Doc. 404-18 at 2; *see also* R. Doc. 404-16 at 3.
[120]   R. Doc. 404 at 21.
[121]   R. Doc. 404-23.

performed those projects, such misrepresentation does not amount to soliciting customers using confidential information.

### 3. Improper Disclosure of Covered Information and Failure to Maintain Confidentiality of Covered Information

WWCS further argues that Oceaneering violated the NDA by improperly disclosing confidential information to Premier Industries and by failing to maintain the confidentiality of information covered by the NDA.[122] But WWCS fails to point to sufficient evidence in the record in support of these arguments.

First, WWCS merely speculates that the design criteria Oceaneering sent to Premier Industries includes confidential WWCS information. Thus, WWCS has not raised a genuine dispute as to whether Oceaneering violated the NDA by improperly disclosing confidential information to Premier Industries.

Second, WWCS's argument about Oceaneering's failure to maintain the confidentiality of WWCS information is based on the same theory of misuse discussed in the previous section: that Oceaneering failed to prevent confidential information from falling into the hands of the FRS development team members. WWCS appears to argue that this violated Section Five of

---

[122] R. Doc. 404 at 24-25.

the NDA, which requires the receiving party to "exercise at least the same degree of care to safeguard the confidentiality of the confidential information as it would exercise to safeguard the confidentiality of its own confidential information of like nature."[123]   This section does not explicitly prohibit disclosure of confidential information from one Oceaneering employee to another, and WWCS points to no Oceaneering policy that imposes a similar restriction on confidential Oceaneering information.   Thus, WWCS has not raised a genuine dispute as to whether Oceaneering violated the NDA by failing to maintain the confidentiality of information covered by the NDA.

### D.    WWCS's Motion to Exclude

WWCS moves to exclude the report and affidavit of expert Norm McMullen on a number of grounds.  Because there are genuine disputes of material fact barring summary judgment against WWCS on its breach of contract claim regardless of whether McMullen's report and affidavit are proper summary judgment evidence, the Court need not decide the motion to exclude at this point.  The Court will issue a separate order addressing whether McMullen's report is admissible at trial.

---

[123]    R. Doc. 404-2 at 3.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES Oceaneering's motion for summary judgment.

New Orleans, Louisiana, this __19th__ day of April, 2018.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE